[No. A065195. First Dist., Div. One. July 1, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT MORRIS FENENBOCK et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III through IX.

1690

**COUNSEL**

Marcia C. Levine, Eric S. Multhaup and Janice M. Lagerlof, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, and Herbert F. Wilkinson, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**DOSSEE, J.**—Nine people—six men and three women—were charged with the murder of Gary "Hop" Summar and conspiracy to murder. After certain defendants' cases were severed, trial proceeded against the three defendants now before us: Robert Morris Fenenbock, Sue Hamby and Cherri Frazier. The jury found defendant Fenenbock guilty of first degree murder but not guilty of conspiracy. The jury found defendants Hamby and Frazier not guilty of murder but guilty of conspiracy to commit murder.

Defendant Fenenbock was sentenced to state prison for 25 years to life for murder plus 1 year for use of a deadly weapon. Defendants Hamby and Frazier were sentenced to 25 years to life for conspiracy. All three defendants appeal.

## Facts

The events occurred in Hawkins Bar, a small hamlet located on Highway 299 in Trinity County. Hawkins Bar consists of a general store, a set of BP gasoline pumps adjoining the store, and a bar (Simon Legree's) located across the highway from the store. Next to the store was a trailer park. It was here that Barbara Adcock lived with Bernard "Bird" MacCarlie and her three children from a prior marriage.

Below the highway, along the river, was a United States Forest Service campground accessible by a service road. In September and October 1991 a group of people were camped in the campground. They were described by local residents as drunk and violent, especially wild and out of control. Some of the campers had been there several weeks; some were drifters. One couple had come to get married at the Harvest Moon Festival on October 5. Defendant Cherri Frazier was there to attend the wedding. Some of the local residents—including Adcock, MacCarlie and defendants Fenenbock and Hamby—spent time at the campground.

*The Prosecution's Case*

It was the prosecution's theory that Hop Summar was killed by a mob from Hawkins Bar seeking to avenge an alleged act of child molestation upon Barbara Adcock's daughter.

*The Victim*

Hop Summar was a pathetic figure. Crippled from numerous childhood orthopedic surgeries, he walked with a limp (hence the nickname, "Hop").

Though he was in his 30's, he was physically frail, wore a colostomy bag, and had a rather meek disposition. He lived on SSI (Supplemental Security Income) and drank to excess nearly every day. He seldom bathed and was distinctive for his offensive body odor.

Hop had known Bird MacCarlie for several years, and he often lived with Bird in the trailer Bird shared with Barbara Adcock and her children. Sometimes Hop looked after Adcock's children while Adcock was partying at the campground.

*The Molestation Accusations*

On September 30, 1991, Barbara Adcock reported to the Trinity County Sheriff's Department that Hop Summar had molested her five-year-old daughter Rachelle H. (Ultimately neither the sheriff nor the county's child protective services found any evidence that Rachelle had been molested.) Adcock and Bird MacCarlie then proceeded to spread the accusations among the denizens of Hawkins Bar.

*Solicitation of Mike Sutton*

Defendant Cherri Frazier arrived at the Hawkins Bar campground on September 30. She was there to attend the wedding of Leafe and Michelle Dodds. Frazier had camped at Hawkins Bar earlier that summer.

Almost immediately upon her arrival, Frazier encountered Barbara Adcock, who told her of the molestation of Rachelle. That same day, or the following day, Frazier gave a ride to Mike Sutton, a drifter also camping at Hawkins Bar. During the ride Sutton noticed a blue-handled knife on the dashboard. Frazier said, "I'm going to go and cut off Hop's balls." Frazier asked Sutton to come with her, but he refused. She then told him to "stay out of it."

In that same ride, Frazier told Bert Jones (another transient camped at Hawkins Bar) that she needed to do something about Hop's molestation of Barbara Adcock's daughter; that she would drag Hop into the woods herself and kill him if she had to.

On the evening of October 1, Mike Sutton was in the campground and heard Bird MacCarlie, Barbara Adcock and "Redbeard" Bob Bond discussing how to kill Hop. Barbara Adcock was sitting at a picnic table with defendants Cherri Frazier and Sue Hamby. Barbara and Cherri asked Sutton if he wanted to be in on it, as they were not getting any help from the others.

He declined. As he walked away from the group of women, Sutton heard the women discussing that defendant Sue Hamby was to keep Hop at her house so that Barbara Adcock could find him once she rounded up help to hurt him. Later that night, Sue Hamby apologized to Mike Sutton for being so forward in the conversation.

*The Assaults Upon Hop*

On October 1, Hop went into Arcata and withdrew $600 in cash from his bank account. About 5:30 in the evening, he returned to Hawkins Bar, having hitched a ride. The driver dropped him at the BP pumps. As Hop tried to enter the trailer where he resided with MacCarlie and Adcock, a group approached him and began to call him a rapist and a child molester. Included in the group were MacCarlie, Adcock, defendant Fenenbock, defendant Frazier and others. As the crowd egged her on, a woman named April May Gault chased Hop, caught up with him when he stumbled, and beat him.

The attendant at the BP pumps did not see the beating, but he saw Hop just afterward. His face was cut and bleeding. Hop told him April May had hit him with a beer can.

Sometime later, Hop was assaulted again. About 6 p.m. he went into Simon Legree's, the town bar. The bartender and patrons observed that Hop's face was cut and bleeding. Hop told the bartender that Harry Darr had struck him in the face with a pistol because he had refused to get into Darr's truck.

Indeed, just beforehand, Harry Darr had come into Maeolla Berry's trailer in the trailer park. When he left, he jumped into his truck and rode across the highway. Maeolla Berry could see a gun in the truck. Hop Summar was standing across the street. Maeolla Berry did not see Darr get out of his truck, but she heard Hop yelling for help, and she saw Darr drive off as patrons of the bar came out to help.

*Defendant Hamby's Role*

Defendant Sue Hamby lived in a trailer east of Hawkins Bar. Her friend, Michael "Scarecrow" Roanhouse, lived in a second trailer on Hamby's property. She gave him food in exchange for repairwork on the property. Hamby was engaged to marry Tex Lockley.

On the morning of October 1, Barbara Adcock and her children appeared at Hamby's trailer. Adcock told Hamby her accusations against Hop Summar. After Adcock left, Hamby told Scarecrow Roanhouse, but Scarecrow said he did not believe Adcock's story.

That afternoon, Hamby went to Maeolla Berry's trailer and asked for her advice. Hamby told Maeolla Berry that she was supposed to keep Hop in her trailer and let Barbara Adcock know so that Adcock could call the police. Berry advised Hamby to call the police herself.

After their conversation, Berry drove Hamby to the campground so Hamby could retrieve her truck. On the way Hamby telephoned Hop to tell him to stay where he was, at Simon Legree's, and she would pick him up. Later that evening, Hamby and Scarecrow Roanhouse came into Simon Legree's. Hop was dozing on his bar stool, with his purple backpack at his side. When he awoke, Hamby got him into her truck and drove him to her trailer. He slept on her couch. The next morning, Hamby left her trailer and went to the campground. According to her testimony, Hamby told Scarecrow to keep an eye on Hop in case the police arrived.

## The Confrontation With Hop

Hop did not stay in Hamby's trailer. About 6:15 or 6:30 p.m. Tex Lockley and Scarecrow Roanhouse were driving in Lockley's red flatbed truck from the general store down to the campground when they saw Hop on the access road. They stopped and gave him a ride in the back. Hop was carrying his purple backpack.[1]

As the truck approached the campground, however, a group angrily came toward the truck, shouting, "Get him out of here." Barbara Adcock shook a baseball bat, yelling, "Get the fuck on out of here." Tex Lockley shifted quickly into reverse and backed the truck up the hill to the highway.

Scarecrow Roanhouse testified that as the truck reached the top of the hill and the passengers got out, defendant Fenenbock and Redbeard Bob Bond walked toward the truck. The two men walked up to Hop and struck him in the face. Redbeard Bob hit him in the mouth; defendant Fenenbock hit Hop in the eye. They accused Hop of being a child molester, and Hop replied, "Not guilty. Not guilty."

At this point Steven Thayer was walking up the access road and passed the red truck. As he did so, he saw Bird MacCarlie and Leafe Dodds drive up in Barbara Adcock's white Ranchero.[2] They, too, talked to Hop, and Hop replied that he had not done anything. Hop asked, "What are you going to

---

[1] Tex Lockley's truckbed was bloodied from the carcass of a wounded pit bull dog.

[2] Meanwhile, Mike Sutton was in the campground and saw Bird MacCarlie leave in the white Ranchero with Randy H. part way under some blankets in the back. Defendant Fenenbock was not in the campground. He showed up later that evening, along with Bird MacCarlie, Redbeard Bob Bond, and Tex Lockley.

do? Kill me here? Throw me in the bushes or something?" Bird MacCarlie replied, "Yeah, something like that." Steven Thayer testified that when last he saw Hop, Hop was seated inside the Ranchero between Redbeard Bob Bond and Bird MacCarlie. The Ranchero pulled out onto the highway and headed east. The red truck followed.

*The Murder*

Barbara Adcock's son, Randy H., Jr., then age nine, was sleeping on a mattress in the back of the white Ranchero. He testified that after stopping at the top of the hill the Ranchero drove to a place where the men started stabbing Hop. The men included Bird MacCarlie, defendant Fenenbock, Redbeard Bob Bond and Leafe Dodds. Afterwards the men dragged Hop to another spot.

Four days later, on October 6, Hop Summar's body was discovered at a logging site. The body was covered with branches and dirt. A piece of rope was found nearby and there were ligature marks on Hop's arms, suggesting he had been tied and dragged. Two logs found nearby were bloodied with Hop's blood. A bloody knife was found 50 to 75 feet away. The blood was Hop Summar's. The knife was the same one used by Bird MacCarlie earlier on October 2 to stab Bert Jones. Faint tire marks consistent with Tex Lockley's red truck (but not the Ranchero) were found in the roadway at the end of the drag marks.

Hop Summar died of multiple stab wounds and bludgeoning. His genitals showed signs of severe trauma from a blunt instrument. Numerous bones in his face were fractured. His left ear had been cut off while he was still alive. He had been stabbed 18 times in the skull, 13 times in the chest. His left eye had been cut out. His arm and leg had been stabbed, bringing the total stab wounds to over 70.

*The Stabbing of Bert Jones*

Earlier on the day of the murder, on October 2, Bert Jones, a drifter staying in the campground, got into an altercation with Michelle Dodds. Defendant Cherri Frazier intervened by pushing Jones and demanding that he leave. Barbara Adcock came at Jones with a baseball bat. Jones retreated to his camp about a quarter of a mile from the main campground to pack up and leave.

That evening, Bird MacCarlie and Tattoo Ernie Knapp having heard about Jones's run-in with Michelle Dodds, drove in the Ranchero to Jones's

campsite. Bird MacCarlie jumped out of the car and immediately began stabbing Jones. Bird MacCarlie forced Jones and his camp mate, Steven Thayer, into the Ranchero, and they drove back to the main campground. When Jones got out of the car, Bird MacCarlie put a knife to his ear and threatened to cut it off. Harry Darr eventually intervened and told Jones to leave. Throughout the assault upon Jones, Barbara Adcock castigated Jones for defending Hop.[3]

Bert Jones and Steven Thayer separately walked up the access road to Hawkins Bar. (It was on this walk that Thayer observed the confrontation between the men in the white Ranchero and Hop Summar.) At the general store Jones showed his stab wound to some people, and one man drove them to the nearest hospital in Willow Creek. There Jones called 911.

Jones told the responding sheriff's deputy that a man named "Hopalong" was going to be killed or injured. As a result of Jones's report, sheriff's deputies descended upon the campground to investigate. They did not find Hop's body. (It was not discovered until October 6, by a local resident searching for wood.) But they did uncover some incriminating pieces of evidence.

*The Investigation*

When various officers (from Humboldt and Trinity County Sheriff's Department, the California Highway Patrol, the Department of Forestry) arrived in Hawkins Bar, the white Ranchero was parked at the top of the access road with Bird MacCarlie in the front seat.

Sergeant Kartchner, the investigating officer, first checked several places he thought he might find Hop—Sue Hamby's trailer, Bird MacCarlie's trailer, and adjoining trailers. In the trailer occupied by Ron Ammon and Ila Olson he found Redbeard Bob Bond and defendant Fenenbock, both drunk and disheveled. Neither had seen Hop, they said.

Sergeant Kartchner headed for the campground. On the way, he passed the white Ranchero with Bird MacCarlie at the wheel. Sergeant Kartchner stopped to talk to MacCarlie, and within a few minutes Randy H. popped up from beneath some blankets in the back of the truck; he then sank back down again.

A trail of blood drops led from underneath the Ranchero to a larger area of blood near some beads and scalp hair. The officers asked MacCarlie to move

---

[3] A couple of days earlier, when accusations were circulating about Hop's molestation, Bert Jones had expressed his view to the group at the campground that he did not believe Hop was guilty. After that, Bert Jones felt unwelcome at the campground, shunned by the others.

the Ranchero so they could get a better look, but MacCarlie told them the truck was inoperable. The officers pushed the vehicle forward.

Bird MacCarlie had a fresh cut on his index finger. He wore a knife sheath, but the sheath was empty. He was barefoot and wearing a clean Hard Rock Cafe T-shirt. MacCarlie was eventually placed under arrest that night.

Down in the campground, Sergeant Kartchner interviewed several people. Tex Lockley had a bloody knife and was arrested. Deputy Rist was assigned to stand by defendant Sue Hamby while she was waiting to be questioned. The deputy observed and seized a large buck knife in her back pocket. Human blood was later detected on the knife.

Mike Sutton told Sergeant Kartchner that night that he knew nothing. Later, however, he provided much of the incriminating evidence against defendants.

*The Aftermath*

Mike Sutton testified that on the night of October 2, Tex Lockley returned to the campsite and said to Barbara Adcock, "It's done." Defendant Cherri Frazier replied, "Good." Barbara Adcock told them both to "shut up."

Defendant Fenenbock lived in a trailer on the property of Sid Smith. Redbeard Bob Bond and defendant Fenenbock were dropped off at the Smith residence about 8 p.m. that night by Bird MacCarlie driving the white Ranchero.[4] Fenenbock told Patsy Brown, Sid Smith's wife, "You don't have to worry about that child molester anymore. We took care of him." Patsy Brown later told Sergeant Kartchner that two women were in the backseat of the Ranchero, and she heard Cherri Frazier's voice.

The next day, October 3, defendant Fenenbock, Redbeard Bob Bond, and Barbara Adcock arrived at the home of Sue Mendes in Willow Creek. Fenenbock gloated that the "cops didn't even check [his] hands for blood." When Sue Mendes commented that she hoped Hop's body was not in locations where she hunted for mushrooms with her children, both Fenenbock and Redbeard Bob told her not to worry about it.

*The Backpack*

On the morning of October 3, Mike Sutton saw defendant Sue Hamby rummaging through the back of Tex Lockley's red truck. She pulled out a backpack, which she said was Hop's.

---

[4]This evidence—from Patsy Brown and from a neighbor of Sid Smith's—corroborates the testimony of Randy H., who said that after the killing Bird drove to Sid Smith's and dropped off Redbeard Bob and defendant Fenenbock.

Scarecrow Roanhouse also saw Hamby with the backpack. He saw her open it, search through it, then wipe the outside with a wet cloth. She asked Scarecrow to burn it, but he refused. According to Scarecrow, Mike Sutton suggested cutting it into pieces.

That afternoon, Hamby approached Deputy Litts in the campground and told him she wanted to turn over Hop's backpack. He picked it up from her house that evening. Hamby told him Hop had given it to her the day before. The backpack was stained with Hop's blood.

*The Physical Evidence*

Although the white Ranchero was observed near a pool of blood on the night of October 2, Sergeant Kartchner did not notice anything of evidentiary value, and the car was not seized until late October. By then there were no traces of blood.

Tex Lockley's red truck, however, was seized after a sheriff's deputy noticed blood on it. Blood splatters were found inside the truck, as if numerous blows had been struck there. And bloodstains were found several places on the exterior of the truck. There was also blood on the driver's seat, smeared as if someone sat in it. And there were bloodstains on the seat of Tex Lockley's pants. Rope was also found in the back of the truck.

A shovel found in the red truck had a mixture of blood matching Hop's blood and Bird MacCarlie's blood. Bird MacCarlie had a fresh cut on his finger when he was arrested on October 2. The prosecutor theorized that Bird cut himself burying Hop.

Defendant Fenenbock was arrested the following day, on October 3, on an outstanding warrant. He had a bloody knife which was seized by police. The blood could not be proven to be human.

A $20 bill and a $100 bill in the police inventory were found to be stained with Hop's blood. Bird MacCarlie had $525.59 when he was arrested. Defendant Fenenbock had $32.96. (The booking procedures used by the Trinity County Sheriff's Department do not isolate particular bills taken from prisoners.)

*Fenenbock's Defense*

Defendant Fenenbock testified that he first heard of the molestation allegations on the morning of October 2. He heard Barbara Adcock tell the

group about the molestation, and when someone asked, "What are you going to do about Hop?" Barbara Adcock said the police were looking for him and if anything happened to him, she and Bird would be the first ones the police would come to.

Fenenbock admitted confronting Hop that afternoon with Redbeard Bob Bond at the top of the access road. He claimed that he tried to calm Redbeard Bob down and restrained him from hitting Hop. Fenenbock admitted punching Hop once, but only after Hop swung his backpack at him.

Fenenbock saw the white Ranchero drive up with Bird MacCarlie driving and Leafe Dodds and Harry Darr in the backseat. There was also a yellow Toyota truck with someone in the driver's seat.[5] Fenenbock, however, left the scene and went back down to the campground. Redbeard Bob Bond and Harry Darr came with him. Later, Bird MacCarlie returned to the campground and gave defendant Fenenbock and Redbeard Bob Bond a ride back to Fenenbock's trailer on Sid Smith's property.

Trena Knapp, wife of Tattoo Ernie Knapp, testified that after the confrontation with Bert Jones she saw Bird MacCarlie drive the white Ranchero out of the campground with Redbeard Bob Bond and Leafe Dodds, but it returned five minutes later. After dinner, about 8:30, Bird MacCarlie, Redbeard Bob Bond, and defendant Fenenbock left in the Ranchero with Randy H. asleep in the back.

*Frazier's Defense*

Defendant Frazier testified that she gave a ride to Mike Sutton on September 30, but she did not discuss the molestation accusations with Sutton or threaten Hop. In fact, she did not know about the molestation at that time. She gave Mike Sutton and Bert Jones a ride again on October 1, but there was no conversation about Hop.

Frazier was at the picnic table when Barbara Adcock complained that the authorities were not going to do anything. But Frazier denied discussing how to kill Hop or asking Mike Sutton or Bert Jones if they wanted to be involved.

When Hop came into the campground in Tex Lockley's truck, Frazier took Rachelle H. and the two boys into the bathroom at Barbara Adcock's request. She heard Redbeard Bob Bond yell that Hop was at the top of the hill. And she saw Bird MacCarlie, Redbeard Bob Bond, Leafe Dodds and Randy H. leave the campground in the Ranchero.

---

[5]Tattoo Ernie Knapp had a yellow pickup truck.

Frazier and Michelle Dodds then drove into Willow Creek to buy some tequila. They passed Bert Jones and Steven Thayer hitchhiking on the highway. Frazier testified that she drank too much tequila and passed out for about three hours. When she awoke, she saw Bird MacCarlie, Redbeard Bob Bond, defendant Fenenbock and others in the campground. Bird MacCarlie was wearing no shirt and his hair was wet. He said he had stabbed Hop.

The next day Frazier asked Barbara Adcock what happened to Hop, and Barbara Adcock traced her finger across her throat. Frazier also heard Barbara Adcock and Sue Hamby discussing where the body was located, whether the police would ever find the body.

A few days later, Frazier was riding in the Ranchero with Barbara Adcock when Adcock asked Frazier to look around and see if there was any blood on the door or dashboard. Frazier did not see any.

## Hamby's Defense

Defendant Sue Hamby testified that she and Hop were friends. He showed up at her house on September 29 and joined her and Scarecrow Roanhouse for a barbecue. Hop spent the night on her couch. The next day she dropped him off near the trailer park.

On October 1, Barbara Adcock arrived at Hamby's trailer and told Hamby that Hop had molested Rachelle. Barbara Adcock said she had told the police Hop was staying at Hamby's house and the police were on their way. Hamby replied that Adcock was misinformed; that she (Hamby) did not know where Hop was. Adcock asked Hamby not to tell Hop that the police were coming for him.

That night Hamby went into Simon Legree's bar to use the phone. Hop was there, passed out at the bar. Hop's face had been beaten. Hop told Hamby he had been called a rapist, and he asked Hamby if he could stay at her house for the night. Hop got into the back of her truck, and she drove him to her house. He slept on her couch. When Hamby left the next morning, Hop was still asleep on her couch. She never saw him again.

Hamby went to the campground to see why Hop had been beaten. When she got there, Barbara Adcock complained that the police were not going to do anything about the molestation of her daughter.

Hamby disputed the testimony of Mike Sutton. Hamby denied asking Barbara Adcock or others whether she should keep Hop at her place. When

Barbara Adcock asked Hamby where Hop was, Hamby lied and said she did not know. Later, Michelle Dodds asked Hamby if she was going to keep Hop at her place until Hop could be dealt with. Hamby replied that she was not keeping Hop at her house; that she did not know where Hop was. Hamby denied apologizing to Mike Sutton for soliciting his help.

Hamby left the campground, and when she returned the confrontation with Bert Jones had just concluded. Barbara Adcock was yelling and screaming, and she yelled at Hamby that she was "going to kick [her] ass." Hamby did not see Hop come down into the campground. She was in the bathroom, but she heard Barbara Adcock shout "Get him out of here." When Hamby emerged from the bathroom, Cherri Frazier was entering with the H. children.

Hamby heard but did not see the Ranchero leave the campground. Hamby herself left the campground with Scarecrow and Trena Knapp to get a grill for the barbecue.

On October 3, the day after Hop disappeared, Hamby was in the campground talking with Barbara Adcock, and Hamby told Adcock, "They are not going to find anybody . . . with a helicopter." What she meant was that a helicopter would be useless for finding Hop in the forest.

Hamby denied taking Hop's backpack from Tex Lockley's truck. She denied wiping blood or fingerprints off Hop's backpack. What Scarecrow Roanhouse saw her cleaning was dirt (Scarecrow's footprints) from her own purse. Hamby did turn in Hop's backpack to Deputy Litts—the backpack Hop had left in her trailer.

DISCUSSION

*Instructional Issues*

I. *Lesser Offenses to Murder*

With respect to the charge of murder, the jury was instructed only on murder in the first degree. The trial court found no theory—of either the prosecution or the defense—to permit a jury finding of any lesser degree of homicide. Defendant Fenenbock now argues that the trial court erred in failing to instruct sua sponte on second degree murder and manslaughter. (In the trial proceedings, counsel for Fenenbock did not request any instructions on lesser included offenses, stating, "I think it's all or nothing . . . .")

It is, of course, settled that the trial court must instruct on lesser included offenses, even in the absence of a request, "when the evidence

raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]; accord, *People* v. *Barton* (1995) 12 Cal.4th 186, 194-195 [47 Cal.Rptr.2d 569, 906 P.2d 531]; *People* v. *Wickersham* (1982) 32 Cal.3d 307, 323-324 [185 Cal.Rptr. 436, 650 P.2d 311].)

■ Defendant Fenenbock contends that the jury could have found that the evidence of premeditation and deliberation was weak so as to raise a question whether that element of first degree murder was present. We cannot agree. The prosecution's evidence showed that a group of men, defendant Fenenbock among them, took the victim off into the woods and killed him in retaliation for the victim's suspected molestation of Barbara Adcock's child. When Hop asked Bird MacCarlie if he was going to be taken into the woods and killed, MacCarlie replied, in the presence of defendant Fenenbock, "Yeah, something like that." Hence, there was evidence that defendant Fenenbock accompanied the other men with the understanding that Hop would be killed. There was overwhelming evidence that the killing was deliberate. The men took Hop to a remote location before commencing their murderous assault. They also tied his body and dragged it further into the woods. Hop was stabbed over 70 times by the men; he was mutilated and brutalized. The injuries to Hop's genitals confirm what other evidence also indicated, that the killing was an act of vengeance for Hop's suspected molestation of Rachelle H.

Fenenbock's defense was that he was not present and did not participate in the killing. Hence, the state of the evidence was such that if the jury accepted the prosecution's proof that defendant was among the killers, the jury had ample evidence from which to find premeditation and deliberation.

■ Defendant Fenenbock argues, however, that the jury could have found that defendant acted in the heat of passion upon provocation (rage over Hop's alleged child molestation). Alternatively, defendant asserts that the jury might have concluded that although the provocation was not adequate to reduce the crime to manslaughter, it did negate premeditation and deliberation so as to support a conviction for second degree murder. We treat these theories in some detail.

A. *Manslaughter*

■ Of course, when the evidence suggests that the defendant acted in the heat of passion upon adequate provocation, the trial court must instruct

on voluntary manslaughter. (*People* v. *Brooks* (1986) 185 Cal.App.3d 687, 693 [230 Cal.Rptr. 86].) Both provocation and heat of passion must be affirmatively demonstrated. (*People* v. *Sedeno*, *supra*, 10 Cal.3d 703, 719; *People* v. *Brooks*, *supra*.) ■ Here, the trial court concluded that the evidence did not justify instructions on voluntary manslaughter, and we affirm that decision.

### Heat of Passion

As the Attorney General correctly points out, the desire for revenge does not qualify as a passion that will reduce a killing to manslaughter. (*People* v. *Bufarale* (1961) 193 Cal.App.2d 551, 562 [14 Cal.Rptr. 381].) " '[T]he fundamental of the inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion—not necessarily fear and *never, of course, the passion for revenge*—to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*People* v. *Valentine* (1946) 28 Cal.2d 121, 139 [169 P.2d 1], italics added, quoting from *People* v. *Logan* (1917) 175 Cal. 45, 49 [164 P. 1121]; accord, *People* v. *Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777].)

Here, there was no evidence from which the jury could have found that defendant Fenenbock's reason was so disturbed by anger or outrage that he acted impulsively. Even if, as he claimed, defendant Fenenbock first heard the reports of child molestation on the morning of October 2, he thereupon went about his daily business and did not confront Hop Summar until later in the day when he punched Hop with his fist. Thereafter, Fenenbock accompanied Bird MacCarlie and others to a remote spot where the men again attacked Hop, this time fatally. The only inference to be drawn is that any passions that may have been aroused upon first hearing the reports of molestation had cooled so that the killing became an act of revenge or punishment. (See *People* v. *Golsh* (1923) 63 Cal.App. 609, 617 [219 P. 456].) In fact, the defendant's own testimony refuted any claim of heat of passion. He denied that he was aroused by the angry feelings in the campground and claimed that he tried to calm things down. We find no evidence to justify an instruction on the heat of passion.

### Provocation

■ No specific type of provocation is required. (*People* v. *Berry*, *supra*, 18 Cal.3d 509, 515.) The provocation may be anything which arouses great fear, anger or jealousy. (See 1 Witkin & Epstein, Cal. Criminal Law (2d ed.

1988) Crimes Against the Person, § 512, p. 579.) Generally, it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person. (*People* v. *Berry*, *supra*, 18 Cal. 3d at p. 515; *People* v. *Valentine*, *supra*, 28 Cal.2d at p. 139.) However, where the provocation is so slight or so severe that reasonable jurors could not differ on the issue of adequacy, then the court may resolve the question. (*People* v. *Brooks*, *supra*, 185 Cal.App.3d at p. 693; *People* v. *Bufarale*, *supra*, 193 Cal.App.2d at p. 562.)

In previous cases, the murder of a family member (*People* v. *Brooks*, *supra*, 185 Cal.App.3d 687), a sudden and violent quarrel (*People* v. *Elmore* (1914) 167 Cal. 205, 211 [138 P. 989]), and infidelity of a wife (*People* v. *Berry*, *supra*, 18 Cal.3d 509) or paramour (*People* v. *Borchers* (1958) 50 Cal.2d 321 [325 P.2d 97]) have been held to constitute legally adequate provocation for voluntary manslaughter. On the other hand, neither simple trespass nor simple assault constitute provocation sufficient to reduce the killing to manslaughter. (See 1 Witkin & Epstein, Cal.Criminal Law, *op. cit. supra*, § 513, pp. 580-581.)

■ In the present case, the allegedly abused child was not a relative of defendant Fenenbock, and there is no indication in the record that defendant Fenenbock had any close personal bond with the child or her parents. The child had not been visibly injured. We conclude there is no evidence here from which the jury could have found provocation so serious that it would produce a lethal response in a reasonable person.

B. *Second Degree Murder*

Nor do we believe instructions were required on second degree murder. ■ Defendant Fenenbock relies upon the rule that even when provocation is inadequate to negate the existence of malice so as to reduce the offense to manslaughter, the trial court must nonetheless instruct sua sponte on second degree murder if there is evidence from which the jury could find that the defendant's decision to kill was a direct and immediate response to the provocation such that the defendant acted without premeditation and deliberation. (*People* v. *Wickersham*, *supra*, 32 Cal.3d at p. 329; *People* v. *Dewberry* (1959) 51 Cal.2d 548, 553 [334 P.2d 852]; *People* v. *Valentine*, *supra*, 28 Cal.2d at pp. 131-132; see CALJIC No. 8.73.)

The *Wickersham* court explained that the evidence of provocation must "justify a jury determination that the accused had formed the intent to kill as a *direct* response to the provocation and had acted *immediately* . . . ." (32 Cal.3d at p. 329, italics added.)

■ In the present case, for the reasons we have already expressed, there is no evidence to suggest that the reports of child molesting precluded

defendant Fenenbock from acting without premeditation and deliberation. The prosecution's evidence showed that after confronting Hop Summar on the access road and punching Hop with his fist, defendant Fenenbock drove to a remote spot in the woods, accompanied by a group of other men, for the declared purpose of killing Hop Summar. Fenenbock and the others then stabbed and mutilated Hop in retaliation for his suspected molestation of Rachelle H. Fenenbock made no affirmative claim that he acted under provocation; he maintained that he did not participate in the killing. Having found that Fenenbock did participate in the killing, the jury could not have had reasonable doubt on whether the killing was premeditated.

## II. *Conspiracy*

■ The jury was instructed only on conspiracy to commit first degree murder. Defendant Hamby argues that the trial court erred in refusing to give instructions on lesser offenses as the objects of the conspiracy. Defendant Frazier joins in the argument without discussion.

We agree with the Attorney General that the record does not indicate that instructions on lesser target offenses were requested below. ■ However, the Attorney General acknowledges that the trial court has a sua sponte obligation to instruct on lesser included target offenses if there is evidence from which the jury could find a conspiracy to commit a lesser offense. Under Penal Code section 182, the jury must determine which felony the defendants conspired to commit. The jury cannot perform that task unless it is instructed on the elements of the offense the defendants are charged with conspiring to commit and any lesser offenses which the jury could reasonably find to be the true objects of the conspiracy. (*People* v. *Alexander* (1983) 140 Cal.App.3d 647, 664-665 [189 Cal.Rptr. 906], disapproved on another point in *People* v. *Swain* (1996) 12 Cal.4th 593 [49 Cal.Rptr.2d 390, 909 P.2d 994]; see *People* v. *Horn* (1974) 12 Cal.3d 290, 297, and fn. 4 [115 Cal.Rptr. 516, 524 P.2d 1300].)

■ Defendant Hamby argues in her brief that instructions should have been given on conspiracy to commit second degree murder. She reasons as follows: The jury could have found that the conspiracy into which she entered was a conspiracy to hurt Hop Summar—to punish him, yes, but not to kill him. Because coconspirators are liable for the reasonably foreseeable consequences of the planned offense and because death was a reasonably foreseeable consequence of the plan to inflict physical harm, the jury could have found a conspiracy to commit second degree murder.

Hamby's reasoning is faulty. The principle that conspirators are liable for the reasonably foreseeable consequences of the planned offense would

render Hamby liable for the *substantive* offense of second degree murder, not for conspiracy to commit second degree murder. (E.g., *People v. Superior Court (Quinteros)* (1993) 13 Cal.App.4th 12, 21 [16 Cal.Rptr.2d 462]; *People v. Luparello* (1986) 187 Cal.App.3d 410, 435-445 [231 Cal.Rptr. 832].) The offense of conspiracy requires not only the intent to conspire, but also the specific intent to commit the planned offense. (*People v. Horn, supra,* 12 Cal.3d at p. 296.) Under Hamby's theory, the conspirators had no specific intent to kill; thus, they could not be convicted of conspiracy to murder. (*People v. Swain, supra,* 12 Cal.4th 593.)

The more logical argument underlying Hamby's theory is that the jury should have been instructed on conspiracy to commit offenses other than murder, e.g., assault, battery, or mayhem. We requested supplemental briefing on whether assault, battery, and mayhem qualify as offenses necessarily included within the charged target offense of murder. We conclude they do not.[6]

■ An offense is necessarily included in the charged offense if (1) under the statutory definition of the charged offense the charged offense cannot be committed without committing the lesser offense, or (2) the charging allegations of the accusatory pleading include language describing the offense in such a way that if the charged offense was committed as specified, the lesser offense was necessarily committed. (*People v. Clark* (1990) 50 Cal.3d 583, 636 [268 Cal.Rptr. 399, 789 P.2d 127]; *People v. Geiger, supra,* 35 Cal.3d 510, 517, fn. 4.)

■ Here, the parties concede that neither assault, nor battery, nor mayhem qualify as offenses included within the statutory definition of murder. (See *People v. Toro* (1989) 47 Cal.3d 966, 972 [254 Cal.Rptr. 811, 766 P.2d 577] [battery is not within the statutory definition of attempted murder].) However, defendants Hamby and Frazier argue in their supplemental briefs that the offenses qualify as lesser included target offenses by virtue of language in the information describing the overt acts.[7] We are not persuaded.

---

[6]Because no instructions were requested, we do not decide here whether the offenses of assault, battery, or mayhem would qualify as lesser *related* target offenses to justify instructions upon request. (*People v. Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055].)

[7]Specifically, the third amended information charged that defendants "did conspire together to murder Gary L. 'Hop' Summar and thereafter in furtherance of said conspiracy . . . did commit the following overt acts: . . . [¶] [A] number of conspirators talked in the Hawkins Bar Campground of what was to be done to suspected child molester Gary L. 'Hop' Summar. . . . [¶] [Bird] MacCarlie went around to different individuals asking if they were 'in on it or not.' . . . [¶] [Redbeard Bob] Bond called Gary L. 'Hop' Summar a child molester and hit him. . . . [¶] [Defendant] Fenenbock called Gary L. 'Hop' Summar a child molester

In *People* v. *Marshall* (1957) 48 Cal.2d 394, 405 [309 P.2d 456], the Supreme Court first authorized using the language of the accusatory pleading as a yardstick for measuring what offenses qualify as "necessarily included" offenses for purposes of deciding whether the defendant could properly be convicted of a lesser offense. The Supreme Court reasoned that when the charging allegations reveal all the elements of a lesser offense, the defendant is fairly put on notice that he should be prepared to defend against a showing that he committed the lesser offense. (*Id.* at pp. 399, 405 [defendant charged with robbery of an automobile could be convicted of lesser offense of auto theft].)

Here, in the context of deciding whether the trial court was obligated to instruct sua sponte on lesser included offenses, we conclude that allegations of overt acts committed in furtherance of the alleged conspiracy do not provide notice of lesser included target offenses.

■ For the crime of conspiracy, the criminal act is the agreement. The agreement is not punishable unless some overt act was committed in furtherance of the conspiracy. (Pen. Code, §§ 182, subd. (b), 184.)[8] But the overt act itself need not be committed by the defendant, and it need not be a criminal offense. (*People* v. *Robinson* (1954) 43 Cal.2d 132, 139-140 [271 P.2d 865].) "To render him guilty it is not necessary that a conspirator perform some act which is in itself unlawful in carrying out the criminal conspiracy. If there is a conspiracy to commit murder by means of poison sent through the mail, a conspirator may not escape responsibility because he only agreed to and did purchase the postage stamps with which the poison is sent to the victim, an act entirely lawful in itself, but punishable if done under an agreement among the conspirators and in carrying out the unlawful purpose of the conspiracy." (*People* v. *Corica* (1942) 55 Cal.App.2d 130,

---

and hit him. . . . [¶] [A] conspirator bound Gary L. 'Hop' Summar's arms. . . . [¶] [A] conspirator cut off one of Gary L. 'Hop' Summar's ears. . . . [¶] [A] conspirator gouged out one of Gary L. 'Hop' Summar's eyes. . . . [¶] [A] conspirator broke bones in Gary L. 'Hop' Summar's face. . . . [¶] [A] conspirator broke one of Gary L. 'Hop' Summar's ribs. . . . [¶] [A] conspirator hit Gary L. 'Hop' Summar in the testicles. . . . [¶] [C]onspirators repeatedly stabbed Gary L. 'Hop' Summar with knives."

[8]The prosecution must plead and prove, in addition to a criminal agreement, an overt act (Pen. Code, §§ 182, subd. (b), 184), and due process principles require that overt acts be pleaded with particularity to give the defendant notice of the prosecution's theory. (*Feagles* v. *Superior Court* (1970) 11 Cal.App.3d 735, 739-740 [90 Cal.Rptr. 197].) We need not reach the question whether the overt act is an actual element of the conspiracy. The Attorney General relies upon cases holding that the jury need not unanimously agree upon the same overt acts. (E.g., *People* v. *Von Villas* (1992) 11 Cal.App.4th 175, 234-235 [15 Cal.Rptr.2d 112]; *People* v. *Jones* (1986) 180 Cal.App.3d 509, 516-517 [225 Cal.Rptr. 697].) Yet, the case law is in conflict on this point. Other cases have held that the overt act is an element of the crime of conspiracy and jury unanimity is required. (See generally, 1 Witkin & Epstein, Cal. Criminal Law, *op. cit. supra*, § 178, pp. 198-199.)

134 [130 P.2d 164].) It is the agreement, not the overt act in furtherance of the agreement, which constitutes the offense.

■■■ Because overt acts need not be criminal offenses or even acts committed by the defendant, the description of the overt acts in the accusatory pleading does not provide notice of lesser offenses necessarily committed by the defendant.[9] Moreover, inasmuch as overt acts may be lawful acts, the overt acts do not necessarily reveal the criminal objective of the conspiracy. For example, in the hypothetical posed by the *Corica* court, an alleged overt act of purchasing postage stamps provides no notice of even the charged target offense of murder, much less of a necessarily included target offense.[10]

In our view, it is the description of the agreement within the accusatory pleading, not the description of the overt acts, which must be examined to determine whether a lesser offense was necessarily the target of the conspiracy. Here, the information alleged only that defendants conspired to murder Hop Summar. There is nothing in this terse description of the agreement to indicate an agreement with a lesser objective. We therefore hold that the trial court was not required to instruct the jury sua sponte on conspiracy to commit assault, battery, or mayhem as lesser offenses included within the charged offense of conspiracy to commit murder.[11]

---

[9]Indeed, in the present case some of the alleged overt acts were allegedly committed by Bird McCarlie or persons other than defendants Hamby or Frazier, and some acts were themselves lawful, e.g., talking about what was to be done with Hop, calling Hop a child molester.

[10]We reject the Attorney General's argument that allegations of overt acts are analogous to enhancement allegations, which the Supreme Court has held are not part of the accusatory pleading for the purpose of defining lesser included offenses. (*People* v. *Wolcott* (1983) 34 Cal.3d 92, 100-101 [192 Cal.Rptr. 748, 665 P.2d 520] [assault with deadly weapon held not a lesser included offense under a charge of robbery with enhancement for use of a firearm].) In *Wolcott*, the Supreme Court reasoned that (1) because an enhancement allegation becomes relevant only if the defendant is convicted of the substantive crime, a defendant may not be adequately notified, to satisfy principles of due process, that he must controvert the enhancement allegation to protect against a conviction for a lesser offense; and (2) because the jury determines the truth of an enhancement allegation only after it determines guilt on the charged or a lesser offense, this procedure would become muddled if evidence of the enhancement must be considered in determining guilt of a lesser offense. Neither of these considerations applies to overt acts of a conspiracy.

[11]The argument of Hamby and Frazier that the agreement was not, as alleged, to murder, but merely to assault, batter, or maim, is in essence an argument that there was more than one conspiracy: a conspiracy to assault, batter, or maim (of which Hamby and Frazier were a part) and a separate conspiracy to murder (of which Fenenbock and the other killers were a part). (See, e.g., *People* v. *Skelton* (1980) 109 Cal.App.3d 691, 717-719 [167 Cal.Rptr. 636].) However plausible this argument might have been at trial, it was not made. No instructions were requested, and the trial court had no sua sponte duty to instruct upon this theory.

III.-IX.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Strankman, P. J., and Stein, J., concurred.

Petitions for a rehearing were denied July 31, 1996, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied October 2, 1996.

---

*See footnote, *ante*, page 1688.