Filed 6/20/25  P. v. White CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>SETH ALLEN WHITE,<br><br>    Defendant and Appellant. | G062632<br><br>(Super. Ct. No. 17NF1416)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Andre Manssourian, Judge. Affirmed.

Justin Andrew Behravesh, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Christopher P. Beesley, Michael J. Patty and Sahar Karimi, Deputy Attorneys General, for Plaintiff and Respondent.

\*         \*         \*

A homicide that would otherwise be murder may be reduced to voluntary manslaughter if the defendant killed "upon a sudden quarrel or heat of passion." (Pen. Code, § 192, subd. (a).)[1]

Defendant Seth Allen White repeatedly hit his mother in the head with a baseball bat following an argument. She was rendered unconscious and died about a year later from catastrophic brain injuries.

The People charged White with murder. At a jury trial, White testified that he hit his mother after she told him, "'You are just like your father.'" The trial court instructed the jury on voluntary manslaughter as a lesser included offense of murder. The jury found White guilty of murder in the second degree.

White argues there is insufficient evidence to support his murder conviction because no reasonable juror could have rejected his voluntary manslaughter defense. We disagree and affirm the judgment.

I.

FACTS AND PROCEDURAL BACKGROUND

In December 2016, White turned 18 years old and lived with his mother (Mother) and his older sister (Sister) in an Anaheim mobile home park. White's father (Father) had divorced Mother when he was about four years old, and there had been a lengthy and contentious court battle between them regarding White's custody.

On May 9, 2017, White sent a Facebook message to a friend stating, "I'm tired, but still really pissed and kind of want to start a mother murder epidemic like in the news today." At some point, White told another

_____

[1] Undesignated statutory references are to the Penal Code.

2

friend that he hated Mother and Sister, and he felt like a "house b*tch" because he was made to clean the house. White also told this friend that he wanted to kill Mother, but the friend felt White was just "venting."

On the evening of May 23, 2017, White was arguing with Mother and Sister. The argument had to do with White's failure to clean his room. At about 8:00 p.m., Sister left and went to a restaurant because: "I needed to get out of there. There was a lot of tension."

At 8:45 p.m., a neighbor called 911, and reported that a female was "screaming" within the White's home. The female was yelling, "'Help me. Help me.'" The caller said that "the house was shaking like someone was getting beaten up or pushed around." The neighbor's son approached the home and heard three to five thumping noises and a heavy weight dropping to the floor. During the course of the 911 call, White closed all the windows and doors.

White made a two-second video on his phone of Mother lying unconscious on the floor in a pool of blood as he stated, "Sleepy time, she comes." White left the home carrying a baseball bat and unsuccessfully tried to start Mother's van. White then walked to a nearby riverbed where he called a friend and said that he had "killed his mom." White called 911 stating he had "just committed an act of assault, possible . . . manslaughter." White said he hit Mother "a lot of times with the bat and I don't know if she's alive but she was like asleep when I left."

*Police Investigation*

When officers arrived at the White's home, they forced entry into the locked trailer and found Mother lying face up near the front door in a large pool of blood. She was gurgling blood, gasping for air, and was

unconscious. Mother was bleeding from her forehead and mouth, and her left arm appeared to be broken. A broken tooth was found nearby on the ground. There were blood splatter stains on the walls and on the ceiling.

Mother was taken to a hospital, where a doctor diagnosed various injuries and conditions, including: traumatic brain injury, coma, acute respiratory failure, posttraumatic shock, open right skull fracture, multiple facial fractures, bilateral forearm fractures, and acute blood loss. The doctor noted that Mother "was on full life support, and was not expected to live."

White was located by the police and was arrested; an officer said he appeared to be: "Calm and compliant." At the station, White spoke to an investigator for about two hours. White said he had "a bad day" because "I had to clean my room." White said Mother was never abusive, "but I gotta say 'yes' all the time and I just got really, really tired of it." White said he hit Mother about five times with a baseball bat and, "She fell down during the third one." White said he kicked her in the face while she was on the ground, and he cut his foot on her tooth. Mother died about a year later "as a direct result" of the of the injuries inflicted by White.

*Court Proceedings*

The People filed an information charging White with one count of murder. The People further alleged White used a dangerous or deadly weapon (a baseball bat) in the commission of the offense.

During a 13-day jury trial, Sister testified that Mother had worked as a correctional officer for about 23 years. Sister said that Mother had certain house rules, such as cleaning. Sister said Mother was "loving," and she never saw her verbally harass, humiliate, or threaten White. Sister said Mother did not tell White: "You're just like your father.'" Rather, Sister

4

testified Mother would tell White, "'It scares us when you get angry because it reminds us of how your father acted.'"

The defense called several witnesses, including White's friend S.G., who described an incident in 2017 when he was mad at White and hit him, but White did not defend himself. S.G. said Mother was not very friendly. S.G. described an incident when he was at the White's home and Mother became angry and "yanked" a phone charger "cord out of the wall and threw it, saying that we were using her electricity."

Father testified that he divorced Mother in 2001, there was a lengthy custody battle, and that Mother reported to the authorities that he had sexually abused his son. Father said he cooperated in the investigations and submitted to polygraph tests. Father testified that he was eventually awarded full custody. White was then about eight years old, but White moved back in with Mother about six years later. Father testified that he never molested White and that he had recently reconnected with him.

Clinical psychologist Dr. Deborah Berberich testified that she spoke with Mother while she was counseling White in 2015. Berberich said that she was making inquiries of Mother regarding Father's custody status. Berberich testified that Mother threatened to remove White from counseling after Berberich made those inquiries. Berberich said that she received hostile and angry text messages from Mother.

Retired social worker Donah Sewell testified that she had investigated allegations made by Mother against Father in 2001. Mother claimed Father had physically and sexually assaulted White. Sewell said Father was interviewed multiple times. White was also interviewed multiple times, and underwent medical examinations. Sewell testified Mother's allegations were determined to be unfounded, but Mother continued to make

allegations that would result in further inquiries. Sewell said she observed a forensic interview of White when he was about four years old. During that interview, White disclosed that Mother had prompted him to say what he was saying. Sewell testified that there was eventually a sustained finding of emotional abuse by Mother because "she was putting the children through a lot of emotional turmoil that wasn't necessary."

Derrick Jones testified that he is a court mediator who worked on the White's custody case in 2006. Jones said that he had met with the family members and reviewed the available reports. Jones testified that it was his opinion at that time that White's contact with Mother should be supervised, pending an evaluation by a therapist.

White testified that he did not hate Mother and did not want her dead. He said that when he was growing up, he believed Father had raped him based on what he was told by Mother and Sister. White said that he later learned that many people who are sexually assaulted become sexual assaulters themselves, and he feared that he would turn into Father. White said Mother and Sister would often compare him to Father. White said that Mother and Sister were upset at him having friends, and would "try to confine me in the house in certain points."

White said that he had graduated from high school a year early with honors. White testified that after high school he had been working at a restaurant, but he left the job before the assault because he was depressed and had suicidal thoughts. White said he felt like he had to prove to Mother that he was not like Father. White testified that he "couldn't win." White said that when he came home from work, he was not asked about his day, but rather "it would be whatever I didn't do at the time, which was either take out the trash, take the dogs out for a walk, clean my room, things like that."

6

White testified that on the day of the assault, there was a lot of tension in the house, but he "couldn't understand where it was coming from." White said he went to the nearby train tracks where he thought about killing himself. White testified that when he returned home, he argued with Mother because she refused to drive him to a marijuana dispensary. White said he went outside, but Mother came outside and said they needed to talk about "whatever I didn't do that day." White testified he walked back into the house, but Mother would not leave him alone. White said Mother "kept on following me and berating me for what I wasn't doing, berating me for trying to leave the situation, for running away from my responsibilities."

White said that he told Mother that he had come close to taking his life at the train tracks, but she said, "'You're an adult and you can make your own decisions.'" White said he eventually went into his room, and grabbed the baseball bat. White said Mother was yelling at him, and "one of the last things that she said was, 'You are just like your father.'" White said he was in "a frenzy," and swung the bat at Mother, but he wasn't aware of where he was hitting her, and he "wasn't thinking anything." White said that after he realized what he had done, he felt "panic, fear, remorse, disgust." White testified that he did not remember taking the video of Mother as she was lying on the floor.

Forensic psychologist Dr. Richard Lettieri interviewed White after the assault and diagnosed him with posttraumatic stress disorder based on Mother's allegations against Father regarding sexual abuse. Lettieri testified that White and Sister were emotionally abused by Mother, who "was controlling and had difficulty letting . . . her children individuate, be themselves, be separate." Given the facts and circumstances of this case (as asked in a hypothetical question), Lettieri opined that it would be reasonable

for White to feel provoked by Mother at the time he swung the baseball bat.

After the conclusion of testimony, the trial court instructed the jury that "Voluntary Manslaughter is a lesser included crime of Murder as charged in count 1." The jury found White not guilty of murder in the first degree (premeditation and deliberation); the jury found White guilty of murder in the second degree. The jury found true the deadly weapon enhancement. The trial court sentenced White to 15 years to life for the murder conviction, plus one year for the weapon enhancement.

## II.

### DISCUSSION

White claims there is insufficient evidence to support his murder conviction because he argues that no reasonable jury could have rejected his voluntary manslaughter defense. We disagree. We find that even if the jury determined White actually felt provoked (the subjective element), there was sufficient evidence to support the jury's implicit determination that White's sense of provocation was plainly not reasonable (the objective element).

In this discussion we will: (A) state the standard of review in a sufficiency of the evidence challenge; (B) discuss the elements of murder and voluntary manslaughter; and (C) analyze the law as applied to the facts.

### A. Standard of Review

"When considering a challenge to the sufficiency of the evidence . . . , we review the entire record *in the light most favorable to the judgment* to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact *could* find the defendant guilty beyond a reasonable doubt." (*People v.*

8

*Lindberg* (2008) 45 Cal.4th 1, 27, italics added.)

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

"The reviewing court presumes in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction." (*Ibid.*)

## B. Murder and Manslaughter

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) The required "malice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when *no considerable provocation appears*, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a), italics added.)

"Manslaughter is the unlawful killing of a human being without malice." (§ 192.) Generally, there are three kinds of manslaughter: voluntary, involuntary, and vehicular. (§ 192, subds. (a)-(c).)

The voluntary manslaughter statute refers to a killing "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) However, an additional element of voluntary manslaughter is provocation. (See § 188, subd. (a)(2).) "Whether the homicide amounts to murder or to manslaughter . . . , does not depend upon the presence or absence of the intent to kill. In either case there

9

may be a present intention to kill at the moment of the commission of the act. But when the mortal blow is struck in the heat of passion, excited by a quarrel, sudden, and of sufficient violence to amount to *adequate provocation*, the law, out of forbearance for the weakness of human nature, will disregard the actual intent and will reduce the offense to manslaughter." (*People v. Freel* (1874) 48 Cal. 436, 437, italics added.)

A homicide may be reduced to voluntary manslaughter "if *the killer's reason* was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an """*ordinary* [*person*] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.""" (*People v. Breverman* (1998) 19 Cal.4th 142, 163, italics added, disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7.)

A trial court has a sua sponte duty to instruct on voluntary manslaughter as a lesser included offense of murder where there is evidence from which a reasonable jury could conclude that sufficient provocation was present. (*People v. Thomas* (2013) 218 Cal.App.4th 630, 643.) When a defendant puts provocation at issue by making a sufficient showing to raise a reasonable doubt, the prosecution must prove malice beyond a reasonable doubt by proving sufficient provocation was lacking. (*Ibid.*)

*C. Application and Analysis*

"The primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not." (*People v. Soto* (2018) 4 Cal.5th 968, 976.) Implied malice murder requires the killing be proximately caused by an act, """"the natural consequences of which are dangerous to life, which act was deliberately performed by a person who

10

knows that his conduct endangers the life of another and who acts with conscious disregard for life.""""(*People v. Reyes* (2023) 14 Cal.5th 981, 988.) The defendant's conduct before and after an attack may be considered in determining whether the requirements have been satisfied. (*People v. Cravens* (2012) 53 Cal.4th 500, 511.)

Here, on at least two occasions prior to the assault on May 23, 2017, White expressed a desire to kill Mother. The evidence is undisputed that White grabbed a baseball bat from his bedroom, went to the front of the trailer, and repeatedly swung the baseball bat at Mother's head, which resulted in her death. White further struck Mother with enough force to cause a skull fracture, multiple facial fractures, and forearm fractures. White also kicked Mother in the mouth, which dislodged her tooth. Further, the facts show that afterwards, White did not immediately call 911 for medical assistance. Rather, White took a video of Mother as she lay on the ground unconscious, and then fled from the home to a nearby location, where he called a friend and told that person that he had just killed Mother.

In short, the facts regarding White's actions before, during, and immediately after the assault plainly support a reasonable inference that he acted with a deliberate intent to kill (i.e., express malice). (See *People v. Avila* (2009) 46 Cal.4th 680, 701-702 [the evidence that defendant repeatedly stabbed an unarmed victim was "substantial evidence of defendant's intent to kill"]; *People v. Smith* (2005) 37 Cal.4th 733, 741 ["it is well settled that intent to kill or express malice, . . . may in many cases be inferred from the defendant's acts and the circumstances of the crime"].)

Further, the same underlying facts also support a reasonable inference that White acted with implied malice. The natural consequences of repeatedly and forcefully striking a person in the head with a baseball bat is

that the victim is likely to perish from the assault. And subjectively, there is evidence White knew that the natural consequence of his assault would result in Mother's death, based, in part, on the disturbing video he made, and his flight immediately afterwards. (See *People v. Bloom*, *supra*, 48 Cal.3d at p. 1208 ["Evidence of a defendant's state of mind is almost inevitably circumstantial"]; see also *People v. Paysinger* (2009) 174 Cal.App.4th 26, 29 ["'If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt'"].)

In short, given the deferential standard of review, we find there is substantial evidence to support White's second degree murder conviction. (See *People v. Bloom, supra,* 48 Cal.3d at p. 1208 ["The reviewing court presumes in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence"].)

White argues that the facts demonstrate that he did "not show that he harbored the necessary malice for second degree murder." Rather White argues that the jury should have returned a verdict of voluntary manslaughter because "there was significant testimony that [Mother] provoked [White] over an extended period of time." We disagree.

Voluntary manslaughter (heat of passion) has both subjective and objective elements: *the defendant* actually killed in the heat of passion (the subjective element); and the circumstances giving rise to the heat of passion—the provocation—would arouse passion in the mind of an *ordinarily reasonable person* in similar circumstances (the objective element). (*People v. Steele* (2002) 27 Cal.4th 1230, 1253.)

As far as the subjective element, White testified at trial that he killed Mother while in "a frenzy" as a result of her telling him that he was "just like your father.'" But that is not what he told the police soon after he

12

assaulted Mother; therefore, the jury could have reasonably rejected his self-serving trial testimony. (See CALCRIM No. 226 ["If you decide that a witness deliberately lied about something significant in this case, you should consider not believing anything that witness says"].)

Further, we agree with the Attorney General that "even if the evidence was sufficient to establish the subjective heat of passion component, there can be no real question that the [People] disproved the objective component." In other words, we find it highly likely that the jurors could have reasonably determined that White did <u>not</u> encounter the kind of provocative conduct that "would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*People v. Manriquez* (2005) 37 Cal.4th 547, 583–584.)

The trial court properly instructed the jury: "It is *not* enough that the defendant simply was provoked. The defendant is *not* allowed to set up his own standard of conduct. You must decide whether the defendant was provoked *and whether the provocation was sufficient*. In deciding whether the provocation was sufficient, consider whether a person *of average disposition*, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." (CALCRIM No. 570, italics added.)

In this case, White testified that he felt provoked because of various issues, including: Mother never offered him positive encouragement; Mother badgered him about not doing household chores; Mother lied to the authorities about Father abusing him; Mother was unsympathetic to his suicidal thoughts; and Mother told him he behaved just like Father. But as the Attorney General's representative stated at oral argument, White "could have left the house, just as he had already done earlier that day."

13

In short, even if we were to presume the jury actually believed White was *subjectively* provoked, then we find sufficient evidence to support the jury's further implied determination that his claimed provocation was not *objectively* reasonable. (See *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1704–1705 ["Generally, it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person"]; compare *People v. Manriquez, supra,* 37 Cal.4th at pp. 585–586 [insufficient evidence of provocation where victim called defendant a "mother f*cker" and taunted him]; *People v. Najera* (2006) 138 Cal.App.4th 212, 226, fn. 2 [insufficient evidence of provocation despite evidence that the victim called the defendant a "f*ggot" and pushed him to the ground].)

To reiterate and conclude, we find sufficient evidence supports White's second degree murder conviction.

III.

DISPOSITION

The judgment is affirmed.

MOORE, ACTING P. J.

WE CONCUR:

SANCHEZ, J.

GOODING, J.

14