Filed 2/19/14  P. v. Garcia CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062370 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS245331) |
| JOSE MANUEL GARCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Frank A. Brown and Peter C. Deddeh, Judges.  Affirmed in part and reversed in part; remanded with directions.

Dacia A. Burz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Alana Cohen Butler and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

This conspiracy and attempted murder case arose when Jose Manuel Garcia, an inmate at Donovan State Prison (Donovan) and an associate in the prison-based Mexican Mafia, became involved in a power struggle with the victim, Victoriano Ortiz, who was also a Mexican Mafia associate incarcerated at Donovan. The prosecution presented evidence that Garcia and his codefendant, Juan Gabriel Morones, who were cellmates, ordered Ortiz to be killed in the prison yard and that, while Garcia and Morones were in their cell, other *inmates* carried out the attack, slashing Ortiz numerous times with a razor blade.[1]

A jury convicted Garcia of the following four felony offenses: (1) conspiracy to commit murder (count 1: Pen. Code,[2] §§ 182, subd. (a)(1), 187, subd. (a)); (2) attempted murder (count 2: §§ 187, subd. (a), 664); (3) solicitation of murder (*count 3*: § 653f, subd. (b)); and (4) assault with a deadly weapon by a prisoner (*count 4*: § 4501).[3] As to each of the four counts, the jury found true an allegation that Garcia committed the offense for the benefit of, at the direction of, and in association with a criminal street

---

[1]    The amended information named six defendants: Eduardo Alberto Macias, Geronimo Polina, Lionel Alvidrez Quinteros, and Francisco Daniel Valencia, in addition to Garcia and Morones. The court granted a pretrial defense motion for severance and a separate trial as to Macias, Polina, Quinteros, and Valencia. Garcia and Morones were jointly tried. Morones is not a party to this appeal.

[2]    Undesignated statutory references will be to the Penal Code.

[3]    The amended information charged Morones with the same four offenses. The jury convicted him of conspiracy to commit murder (count 1) and found true a count 1 allegation that he committed the offense for the benefit of, at the direction of, and in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members. He was acquitted of the other charges.

gang with the specific intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)).

The court sentenced Garcia to an aggregate prison term of 25 years to life plus 19 years, as follows: (1) count 1 (conspiracy to commit murder): an indeterminate term of 25 years to life plus a 10-year consecutive term for the gang enhancement; (2) count 2 (attempted murder): a consecutive nine-year upper term, plus a 10-year term for the gang enhancement that the court stayed under section 654; (3) count 3 (solicitation of murder): a three-year upper term plus a 10-year term for the gang enhancement, for a total count 3 sentence of 13 years that the court stayed under section 654; and (4) count 4 (assault with a deadly weapon by a prisoner): a 16-month term (one-third the middle term of four years) plus a 10-year term for the gang enhancement, for a total count 4 sentence of 11 years four months that the court stayed under section 654.

Garcia appeals, raising the following six contentions: (1) the court's clarifying instruction on the attempted murder charge, informing the jury in response to Jury Note No. 3 that the term "a person" in CALCRIM No. 600, referred to "a defendant," deprived him of due process "when it effectively omitted the required finding of the actual perpetrator's specific intent to kill for derivative culpability based on aiding and abetting and/or conspiracy"; (2) if this court determines that his counsel invited the trial court's erroneous clarifying instruction, counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment; (3) the court prejudicially erred when it failed to instruct the jury sua sponte on conspiracy to commit assault with a deadly weapon as a lesser included offense of conspiracy to commit murder (count 1); (4) the court erred

3

when it imposed the count 1 consecutive 10-year gang enhancement under section 186.22, subdivision (b)(1)(C) because Garcia was sentenced to a life term for his count 1 conviction of conspiracy to commit murder, and, thus, the court should have imposed—under the mandatory alternative sentencing provisions of section 186.22, subdivision (b)(5)—a minimum term of 15 years before Garcia may be considered for parole; (5) the court erred when it imposed 10-year gang enhancements under section 186.22, subdivision (b)(1)(C) as to count 3 (solicitation of murder) and count 4 (assault with a deadly weapon by a prisoner) because neither offense is a violent felony within the meaning of that subdivision' and (6) the court erred when it failed to stay under section 654 the sentence imposed for his attempted murder conviction (count 2) because he was separately punished for his conviction of conspiracy to convict murder (count 1) and the attempted murder was the object of the conspiracy.

The Attorney General agrees with all three claims of sentencing error. Thus, we conclude Garcia's sentence must be modified and the matter remanded for resentencing as to count 3. With the exception of the count 3 sentence, which is reversed and remanded for resentencing, the judgment is affirmed as modified.

## FACTUAL BACKGROUND[4]

On July 5, 2010, the victim in this case—Victoriano Ortiz, an inmate at Donovan—was walking in a prison yard with two allies, Geronimo Polina ("Blue") and

___

[4]    As Garcia and Morones were jointly tried, and Garcia does not challenge the sufficiency of the evidence, the following summary of the facts is principally derived from this court's prior opinion in Morones's appeal. (*People v. Morones* (June 5, 2013, D061505) [nonpub. opn.].)

Manuel Gonzalez ("Stomper"). Blue suddenly turned on Ortiz and attacked him. Numerous other inmates quickly joined the assault on Ortiz, while other inmates attacked Stomper. The prosecution's theory was that the attack was the outcome of a power struggle between two rival factions of the Mexican Mafia then competing for control of Donovan, one of which was led by Ortiz and his "mesa," and the other led by a mesa composed of Garcia ("Crazy Joe"), Morones, and two others. The Mexican Mafia seeks to control prisons using mesas as a command system, which is in effect a governing council. Ordinarily, the chief of the mesa is a "shot-caller" or "key-holder," and he has two or three "helpers" to help run various aspects or areas of the prison. The shot-caller and his helpers comprise the mesa. He derives his authority to run the prison from a "member" of the Mexican Mafia.

A. *The Principal Participants*

Morones was an associate in the Mexican Mafia serving a life sentence at Donovan. His eventual ally, Garcia, is also an active Mexican Mafia associate. Ortiz testified at trial about the structure of the Mexican Mafia. At the bottom of the organizational pyramid are "southsiders," all members of Hispanic street gangs in southern California. These gang members must remit "taxes" (a portion of the proceeds of their illegal activity) to the Mexican Mafia. The next higher level consists of "surenos" or "soldiers," gang members who have garnered authority and more respect than southsiders by working for the Mexican Mafia, collecting taxes or enforcing orders through violent attacks. Above the surenos are "associates," who have worked their way up and are close to "members" (also referred to as "carnals") of the Mexican Mafia. At

5

the top of the pyramid are the carnals, who can order someone killed or assaulted (also called "giving the green light") if the target is not respecting the authority of the Mexican Mafia. Such an order must be followed by all persons within the structure. Orders to attack someone, when issued by the mesa operating under a carnal's authority to run a prison, must be treated with the same obedience.

Ortiz was an associate in the Mexican Mafia and was incarcerated at Donovan to serve time for an assault he committed on its behalf. Ortiz believed his authority to run Donovan derived from his association with and permission from Richard Buchanon.

B. *The Power Struggle for Control of Donovan and the Attack on Ortiz*

Ortiz arrived at Donovan in March 2010 and almost immediately sent out word, through "kites" and word of mouth, that he was now in charge of Donovan and whoever was in charge needed to step down or risk being assaulted. "Kites" are small handwritten notes by which messages are surreptitiously passed to other inmates within the prison (either between cells within a cell block or even between cell blocks) or to persons outside the prison. Ortiz also formed his mesa, which included Stomper (Ortiz's right-hand man), an inmate named "Pino," and Morones. At one point, Morones asked Ortiz for paperwork containing Ortiz's authority, but Buchanon had verbally authorized Ortiz to run Donovan.

Another group apparently disagreed with Ortiz's attempt to exert control, and Ortiz believed this group was trying to challenge his authority. The group included Morones, who had been in a dispute with Stomper, and Pablo Franco ("Casper"). That group began sending kites asserting its authority to run Donovan, which those in the group believed

6

was derived from another carnal, and included messages to Ortiz that Ortiz "had something coming."

When Ortiz noticed that southsiders were beginning to follow Morones's group, he tried to reassert his authority because there can only be one mesa running a prison. Ortiz's efforts to regain control included writing a kite to Morones asking to resolve the power struggle (an offer that did not bear fruit) and challenging Casper to a fight, which Casper declined. Ortiz interpreted Casper's response as acquiescing to Ortiz's authority, and he sent a kite to Casper indicating they both were now working under Buchanon's authority. Ortiz formed a new mesa, including Stomper, Blue and Isaac Balesteros ("Lazy"). For the next month, everything appeared calm with Ortiz in control.

However, in late June or early July, problems over control reemerged after Rudy Espudo ("Crazy Boy"), a carnal, was temporarily incarcerated at Donovan. Espudo gave authority over Donovan to Morones, Garcia (Morones's cellmate), and two other inmates (Casper and an inmate with the moniker "Oso"). Almost immediately, Garcia began yelling on the tier of their cell block that he had "authority" and threatened that Ortiz and Stomper had "something coming", which Ortiz understood to mean he was targeted for attack. Ortiz also saw kites written by Garcia and Morones ordering Ortiz be "whacked" with "no exceptions."

Authorities had placed Garcia in a cell that was surreptitiously wired, and, during this period, numerous recordings were made of conversations between Morones and Garcia, as well as of conversations they had with other inmates. Some of the recordings from July 2, 2010 (three days before the attack on Ortiz and Stomper) showed that

7

Morones had already begun writing a kite to Lazy when Garcia began contributing to the kite. Garcia told Morones to ensure that the kite declare Espudo's direct orders had established the new mesa, and the new mesa was ordering both Lazy and Blue (members of Ortiz's inner circle) to whack Ortiz and Stomper "on this next yard with no exceptions." The next day, July 3, Garcia and Morones discussed whether Ortiz was going to come out to the yard and that he had group yard, and appellant said, "[T]hat's a good thing, that way we can blast the fuck out of him."

When Ortiz went to walk in the prison yard on July 5, 2010, he knew he was risking his safety because there was a chance he would be assaulted. However, he believed he still had authorization to run Donovan and could not show fear, so he nevertheless went into the yard. As Ortiz was walking with two of his allies (Blue and Stomper), Blue suddenly turned on Ortiz and began punching and cutting at him. Other inmates joined in the attack on Ortiz while yet another group of inmates attacked Stomper. Although correctional officers responded by ordering the inmates to get down, and thereafter by firing some shots when the inmates ignored the command, the attackers did not immediately cease but instead continued stabbing Ortiz and banging his head against a wall. Ortiz suffered head and other injuries from the attack.

DISCUSSION

I. *CLAIM OF INSTRUCTIONAL ERROR*
(*COUNT 2*: *COURT'S RESPONSE TO JURY NOTE NO. 3*)

Garcia first contends the court's clarifying instruction on the count 2 attempted murder charge, informing the jury in response to Jury Note No. 3 that the term "a person"

8

in the court's modified version of CALCRIM No. 600 referred to "a defendant," deprived him of due process because "it effectively omitted the required finding of the actual perpetrator's specific intent to kill for derivative culpability based on aiding and abetting and/or conspiracy." We conclude Garcia's claim of instructional error is forfeited under the doctrine of invited error because the record amply shows Garcia's counsel invited the claimed error for tactical reasons.

A. *Background*

With respect to the attempted murder of Ortiz charged in count 2, the record shows the prosecutor proceeded on the theory that Garcia either aided and abetted, or conspired to commit, the attempted murder that was perpetrated by other inmates in the prison yard at Donovan. The prosecution presented no evidence that Garcia was in the prison yard at the time of the attack on Ortiz, and it did not argue that Garcia was one of the perpetrators.

1. *Jury instructions conference*

During the jury instructions conference, the parties agreed that, as to count 2, the court should instruct the jury with CALCRIM No. 563 pertaining to conspiracy to commit murder. The prosecutor commented that he had to tailor the conspiracy instructions in CALCRIM No. 415 et seq. because "[his] theory of culpability is that [Garcia and Morones] are guilty of attempt[ed] murder and assault [by an inmate] on a conspiracy theory." The prosecutor stated he wanted some guidance from the court and defense counsel as to the instructions on those crimes because the instructions referred to

9

"a defendant," but "obviously, these defendants [(Garcia and Morones)] have never touched Ortiz."

The prosecutor then requested the court's permission to modify the instructions to change the term "a defendant" in the instructions to "a person." The court replied, "Okay. I think that's right." Garcia's counsel agreed to the modification, stating, "That's fine."

2. *Jury instructions and modified version of CALCRIM No. 600*

Soon thereafter, the court instructed the jury with CALCRIM Nos. 400 and 401 pertaining to aiding and abetting, CALCRIM Nos. 415 and 417 pertaining to conspiracy, CALCRIM No. 563 pertaining to conspiracy to commit murder, and─of particular importance here─the following modified version of CALCRIM No. 600 in which the court replaced the term "[t]he defendant" in two places with the term "[a] person" (italicized here to emphasize the modification):

> "The defendants are charged in Count Two with attempted murder.
>
> "To prove that a defendant is guilty of attempted murder, the People must prove that:
>
> "1. *A person* took at least one direct but ineffective step toward killing another person; AND
>
> "2. *A person* intended to kill a person.
>
> "A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

10

"A person who attempts to commit murder is guilty of attempted murder even if, after taking a direct step towards killing, he or she abandons further efforts to complete the crime, or his or her attempt fails or is interrupted by someone or something beyond his or her control. On the other hand, if a person freely and voluntarily abandons his or her plans before taking a direct step toward committing the murder, then that person is not guilty of attempted murder."

3. *Jury Note No. 3 and the court's response*

During jury deliberations, the court received Jury Note No. 3 requesting clarification about the meaning of the term "[a] person" in the modified version of CALCRIM No. 600. Specifically, Jury Note No. 3 stated in part:

"We are unclear about who '[a] person' refers to in the attempted murder charge, as well as in other charges."

Outside the presence of the jury and quoting the pertinent portion of the instruction, the court commented:

"[O]bviously, they've got to decide if there was an intent to kill or just to slap around Ortiz. [¶] But, as to element 1, a person took at least one but ineffective step toward killing, well, clearly, it's not Garcia or Morones. They were locked up. And I think it refers to anybody who was a part of the conspiracy."

Garcia's counsel disagreed, stating, "I think we'd be in a lot of trouble if we went forward with that definition." Suggesting CALCRIM No. 600 should *not* have been modified by replacing "[a] defendant" with "[a] person," *she requested that the language contained in the unmodified version of CALCRIM No. 600—"[a] defendant"* (instead of "[a] person")—*be used*.

11

The court then asked Garcia's counsel whether she thought the version of CALCRIM No. 600 given to the jury was "a wrong statement of the law," and counsel replied:

> "I'll defer to the court. I'm not going to tell you I think that it's wrong, but I think it would be wrong to give that response to the jury."

Rejecting that notion and noting that the information named six persons as defendants, the court stated:

> "[N]ever was it the theory of the prosecution that Morones or Garcia actually armed themselves and went to the yard and tried to kill Ortiz. That just didn't happen. And I think that if you find somebody is a member of a conspiracy, and that person, even though not the person who wrote the willa,[5] allegedly, that person takes a direct but ineffective step toward killing somebody, with a specific intent to kill, then I think that's a correct statement of the law. And I think that's what [the jurors are] asking."

Garcia's counsel responded by reiterating that the court's response to Jury Note No. 3 should be that the term "[a] person" in the version of CALCRIM No. 600 given to the jury referred to "[a] *defendant*" (italics added). Counsel also argued that "[t]he instruction says that the person just needs to take a direct but ineffective step toward killing. The direct but ineffective step would be the dictating of the note. You don't have to be the killer. You don't have to be the stabber."

---

5    Ortiz testified that a "willa" is a "kite." As already explained, "kites" are small handwritten notes by which messages are surreptitiously passed to other inmates within the prison (either between cells within a cell block or between cell blocks) or to persons outside the prison.

12

Disagreeing, the prosecutor stated that "[t]he attempted murder is clearly charged as an aider and abettor or co-conspirator [offense]. Because [Garcia and Morones] were not the ones that took the razor to [Ortiz's] head. That's the direct but ineffective step toward killing a person."

Noting that the jury heard the recorded dictation of the willa and that the overt act of writing the willa "completes the conspiracy if [the jurors] find that it happened," the court agreed with the prosecutor and stated that "the conspiracy doesn't equal attempted murder." The court also stated, "[A]s a matter of law, I don't think that there's an attempted murder just because there was an overt act of writing a willa."

The prosecutor agreed with the court, stating that "[t]he jury could conceivably find [Garcia and Morones] guilty of conspiracy to commit murder, and find them not guilty of attempted murder."

The court stated that "[a] person" in the instruction given to the jury "doesn't refer to Garcia or Morones. It refers to a person who acted in the furtherance of the conspiracy."

With the court's permission, Garcia's counsel then consulted with the public defender's appellate department for advice on the matter. Following the consultation, *Garcia's counsel told the court that CALCRIM No. 600 should read* "[*a*] *defendant*" (italics added), not "[a] person."

Agreeing with Garcia's counsel, the court indicated the jury should be told that "[a] person" in the attempted murder charge referred to "[a] defendant." The court explained that, "obviously, a defendant, either Garcia or Morones, did not . . . personally

13

take a direct but ineffective step in the attack on Ortiz" and agreed with the prosecutor's argument that "[a] person" in the attempted murder charge referred to anyone who was a member of the conspiracy to kill another person or who aided and abetted the attempted murder.

The court then proposed that its response state, "'A person' refers in this case to anyone who's a member of a conspiracy who takes a direct but ineffective step toward the killing of another person, or who aids and abets in an attempted murder."

Garcia's counsel objected to the court's proposed response that the term "[a] person" in the attempted murder instruction referred to a member of the conspiracy who was a perpetrator of the attack on Ortiz. Specifically, counsel objected that giving that response would violate Garcia's constitutional rights. She also suggested she may have rendered ineffective assistance by not noticing that the prosecutor had modified the instruction. The court replied, "I don't think you're ineffective at all."

The court then asked Garcia's counsel whether it was a legally incorrect statement to say that the term "[a] person" "refers, in this case, to anyone who's a member of a conspiracy?" Counsel replied, "That's not a correct statement of the law."

Garcia's attorney then told the court the public defender's appellate department had advised her that the term "[a] person" in the instruction referred to "the *defendants* charged in this trial" (italics added). Counsel stated that any other response "would be erroneous and the case could be overturned on instructional error." Garcia's counsel then added:

14

"I think we've already erred by giving [the jury] an instruction that has been altered. *It should have said* [']*defendant*[.'] It says [']a person.['] I think the reason [the jurors are] confused is because [the prosecutor] did alter this instruction. *If it had said* [']*defendant*[,'] as the CALCRIM [No. 600] drafters drafted the instruction, there wouldn't be any confusion. And I think we need to . . . change [']person['] to [']*defendant*[.'] And I think that would be the proper response [to Jury Note No. 3] and the only response that would be legally correct." (Italics added.)

With the court's permission, the prosecutor consulted with the Attorney General's Office. After doing so, the prosecutor told the court the attempted murder instruction should read, "A defendant took at least one direct but ineffective step toward killing another person, and a defendant intended to kill a person." The prosecutor also requested that the court inform the jurors that a defendant could be liable for these acts as coconspirators or aiders and abettors, as defined in the instructions.

Garcia's attorney objected to the "latter verbiage" and again urged the court to delete the term "[a] person" used in the modified version of CALCRIM No. 600 given to the jury and replace it with "[a] defendant." Specifically, counsel stated:

"I don't think we need to include the latter verbiage. I think we just need to change it back to what it should have been at the beginning, and *we should say a person is a defendant charged in this case.*" (Italics added.)

The court reiterated that "you have to let this jury understand that the attempted murder was not just the writing of the willa. That completes the conspiracy. But just writing the willa is not an attempted murder."

During further discussion, Garcia's counsel objected to the prosecutor's suggestion that, in addition to stating that "[a] person" refers to "[a] defendant," the court's response

15

to Jury Note No. 3 should also state that a defendant could be liable for attempted murder "if you find beyond a reasonable doubt that he was a member of the conspiracy or an aider and abettor, as defined" elsewhere in the instructions. Specifically, Garcia's attorney objected by stating:

> "Your Honor, they already have those instructions. *We would urge the court to respond* [to Jury Note No. 3] *with one sentence. A person under the facts of this case refers to a defendant charged here. . . .* All of this other verbiage is going to confuse them. All of the other verbiage is verbiage that is included in other jury instructions." (Italics added.)

After further discussion, the court told defense counsel:

> "[I]t would be a crazy theory to say that Garcia and Morones, who were locked up, took a direct but ineffective step toward killing another person. What they did was they wrote—allegedly wrote a willa, which is an overt act, allegedly, of a conspiracy, from which somebody else, allegedly, who was a member of the conspiracy, did commit a direct but ineffective step toward killing."

The court indicated that to just substitute "[a] defendant" for "[a] person" in CALCRIM No. 600—so that the pertinent part of that instruction on attempted murder stated that "[*a*] *defendant* took at least one direct but ineffective step toward killing another person" (italics added)—would not be a correct statement of the prosecution's theory of vicarious liability because Garcia and Morones were in their cell during the attack on Ortiz in the prison yard, and, thus, they could not have taken a direct but ineffective step toward killing him.

In response, Garcia's counsel stated: "Well then, [the jury will] find them not guilty."

16

Indicating the jury would not necessarily acquit Garcia and Morones of attempted murder under the proposed response to Jury Note No. 3, the court stated: "No. They have the option of using an aiding and abetting or a conspiracy theory." Garcia's counsel pointed out that the jury had been given instructions on those theories of vicarious liability, and the court replied, "Right."

The court then proposed that the response to Jury Note No. 3 should state:

"In regard[] to the attempted murder charge, as well as other charges in the case, '*a person*' *refers to a defendant in this case*. A defendant in this case can be liable for attempted murder if you find beyond a reasonable doubt that he is a conspirator or aider and abettor, as defined in the instructions."

Garcia's counsel responded that the first sentence of the proposed response─"In regard[] to the attempted murder charge, as well as other charges in the case, 'a person' refers to a defendant in this case"─was appropriate. However, she stated she wholeheartedly disagreed with the second sentence because the jury already had been given instructions that defined coconspirator and aider and abettor, and, thus, the second sentence in the proposed response was gratuitous and extra verbiage.

The court ruled that its proposed response to Jury Note No. 3 was a correct statement of the law and stated, "I will sign it and I'll send it in [to the jury]."

a. *The court's response to Jury Note No. 3*

In its written response to Jury Note No. 3, the court stated:

"Answer to question one:

"In regard[] to the attempted murder charge as well as other charges in this case, '*a person*' *refers to a defendant in this case*. A defendant in this case can be liable for attempted murder, if you find

17

beyond a reasonable doubt a defendant is a conspirator or aider and abettor, as defined in the instructions." (Italics added.)

C. *Analysis*

Garcia claims his conviction of the attempted murder of Ortiz charged in count 2 must be reversed and the matter remanded for a new trial on that count because the court clarified in its response to Jury Note No. 3 that the term "a person," as used in the instruction to the jury on attempted murder, referred to "a defendant in this case." In support of this claim he asserts the court's clarifying instruction created, in addition to the prosecution's conspiracy and aiding and abetting theories of criminal liability regarding count 2, "another theory of liability that [Garcia] and Morones were the actual perpetrators" of the attempted murder. He also asserts the court deprived him of due process because its response to Jury Note No. 3 "effectively removed the element of the perpetrator[s'] specific intent to kill on the aiding and abetting or conspiracy theories" of criminal liability. Garcia's claim is unavailing.

1. *Garcia's claim is forfeited under the invited error doctrine*

Under the doctrine of invited error, a party who induces the commission of an error is generally estopped from asserting the alleged error as grounds for reversal. (*People v. Mays* (2007) 148 Cal.App.4th 13, 37.) The California Supreme Court has explained that " '[t]he doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal. . . . [I]t also must be clear that counsel acted for tactical reasons and

18

not out of ignorance or mistake.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49.)

Here, the doctrine of invited error bars Garcia from complaining on appeal that the court erred by telling the jury in its response to Jury Note No. 3 that the term "a person," as used in the modified version of CALCRIM No. 600 referred to "a defendant in this case." The record amply shows the doctrine of invited error applies because Garcia's counsel repeatedly and insistently invited the claimed error and did so for tactical reasons. Early during the lengthy hearing on how the court should respond to Jury Note No. 3, Garcia's counsel twice argued the court's response should be that the term "[a] person" in the modified version of CALCRIM No. 600 given to the jury referred to a "defendant." Shortly thereafter, Garcia's counsel (with the court's permission) consulted with the public defender's appellate department for advice on the matter, and she again told the court (during an unreported discussion, as the court acknowledged) that CALCRIM No. 600 should read "[a] defendant," not "[a] person." Garcia's counsel thereafter urged the court several times more that the court's response to Jury Note No. 3 should be that "[a] person" referred to "a defendant" in the instruction on attempted murder given to the jury. For example, counsel stated, "I think we just need to change it back to what it should have been at the beginning, and we should say *a person is a defendant charged in this case*." (Italics added.) In perhaps the clearest statement of Garcia's position on this matter, his counsel asserted:

> "We would urge the court to respond [to Jury Note No. 3] with one sentence. *A person under the facts of this case refers to a defendant charged here.* . . . All of this other verbiage is going to confuse

19

them. All of the other verbiage is verbiage that is included in other jury instructions." (Italics added.)

The record also shows Garcia's counsel had a tactical reason for requesting that the jury be told that "[a] person" referred to "[a] defendant." When the court indicated the defense's proposed response to Jury Note No. 3 was inconsistent with the prosecution's theory of vicarious liability because Garcia and Morones were in their cell during the attack on Ortiz, Garcia's counsel replied: "Well then, [the jury will] find them not guilty."

A clearly implied tactical purpose is "sufficient to invoke the invited error rule." (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 49.)

Here, the foregoing statement by Garcia's counsel shows the tactical reason for her insistent request, namely, if the term "[a] person" in the modified version of CALCRIM No. 600 given to the jury were changed to "[a] defendant," Garcia might be acquitted of attempted murder because he was a defendant, and he could not have perpetrated the attack on Ortiz because he (Garcia) was in his cell when Ortiz was attacked in the prison yard.

In sum, we conclude Garcia's claim of instructional error is forfeited under the doctrine of invited error because the record amply shows his counsel invited the claimed error for tactical reasons. (See *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 49; *People v. Mays*, *supra*, 148 Cal.App.4th at p. 37.)

20

2. *Merits*

a. *The court did not commit instructional error*

Even if we were to assume Garcia's claim of instructional error is not forfeited under the doctrine of invited error, we would reject his claim on the merits. As noted, Garcia contends the court's clarifying instruction on the attempted murder charge, informing the jury that the term "a person" in the court's modified version of CALCRIM No. 600 referred to "a defendant," deprived him of due process because "it effectively omitted the required finding of the actual perpetrator's specific intent to kill for derivative culpability based on aiding and abetting and/or conspiracy." In support of this claim, he complains the modified instruction originally given to the jury was "confusing and conflicting" because "[i]t did not include introductory language to the effect that 'to prove that a defendant is guilty of attempted murder on either a theory of aiding and abetting or conspiracy,'" but, instead, it simply used the standard introductory language "[t]o prove that a defendant is guilty of attempted murder . . . ."[6]

Garcia's complaint that the court did not include the foregoing introductory language in the instruction is unavailing. In its written response to Jury Note No. 3, the court made it clear to the jury that Garcia was being prosecuted for attempted murder based on conspiracy and aiding and abetting theories of criminal liability.

---

[6]     The version of CALCRIM No. 600 originally given to the jury provided in part: "*To prove that a defendant is guilty of attempted murder*, the People must prove that:  [¶] 1.  A person took at least one direct but ineffective step toward killing another person; AND [¶] 2.  A person intended to kill a person."  (Italics added.)

21

In light of the court's response to Jury Note No. 3, the jury would not have been confused; rather, it would have understood that the prosecution was alleging Garcia was guilty of attempted murder on an aiding and abetting or conspiracy theory of criminal liability.

Also unavailing is Garcia's claim that the jury would not have understood the requirement that the perpetrators of the attack on Ortiz in the prison yard acted with the specific intent to kill him. The court instructed the jury under CALCRIM Nos. 400 and 401 pertaining to aiding and abetting. Specifically, the court instructed the jury under CALCRIM No. 400 as follows:

> "A person may be guilty of a crime in two ways. One, he may have directly committed the crime. Two, he may have aided and abetted someone else, who committed the crime. In these instructions, I will call the other person the 'perpetrator.' A person is equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it."

Of particular importance here, the court also gave CALCRIM No. 401 which clearly informed the jury that, in order for a defendant (like Garcia) to be guilty as an aider and abettor, the prosecution was required to prove he knew the perpetrator "intended to commit the crime" (here, the attempted murder of Ortiz). That instruction stated in part:

> "To prove that a defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] . . . [¶] 2. *The defendant knew that the perpetrator intended to commit the crime*." (Italics added.)

Thus, the jury would have understood that, in order to convict Garcia of the attempted murder of Ortiz charged under an aiding and abetting theory of liability, the

22

prosecution was required to prove beyond a reasonable doubt that Garcia knew that the perpetrators of the attack on Ortiz intended to kill him.

b. *Any instructional error was harmless beyond a reasonable doubt*

Even if we were to assume for the purpose of argument that the court committed the claimed instructional error, we would conclude any such error was harmless.

"[A]n instructional error that improperly . . . omits an element of an offense . . . generally is not a structural defect in the trial mechanism that defies harmless error review and automatically requires reversal under the federal Constitution." (*People v. Flood* (1998) 18 Cal.4th 470, 502-503.) Such an error is reviewed under the harmless error standard announced in *Chapman v. California* (1967) 386 U.S. 18, 24. (*Flood*, at pp. 502-503.) Under the *Chapman* standard, "an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 681; *Chapman*, at p. 24.)

Here, the assumed constitutional error was harmless beyond a reasonable doubt. In support of his claim of error, Garcia complains that the court presented the jury with a "factually insufficient" and "factually invalid" theory that Garcia was a perpetrator of the attempted murder of Ortiz in its response to Jury Note No. 3. However, as the Attorney General correctly points out, the prosecution did not argue that Garcia was the *perpetrator* of the attempted murder, and it presented no evidence that Garcia was in the prison yard at the time of the attack on Ortiz. Garcia has provided no cites to the trial record to show otherwise.

23

Moreover, the evidence overwhelmingly showed the perpetrators of the attack on Ortiz acted with the specific intent to kill him. As discussed in the factual background, authorities had placed Garcia in a cell that was surreptitiously wired and numerous recordings were made of conversations between Morones and Garcia. One of the recordings established that Garcia and Morones wrote a kite ordering that Ortiz be whacked in the prison yard with no exceptions. Ortiz testified that "whacked" meant killed.[7] The prosecution also presented expert testimony establishing that whacked meant murdered.

The Attorney General asserts "[t]here was no evidence that the attack on the yard was anything other than an attempt to kill Ortiz; thus there would be an intent to kill him." We agree. The evidence shows numerous inmates attacked Ortiz in the yard. A razor blade was used to slash Ortiz, who covered his throat with his hand to protect his neck and suffered a razor cut on his finger. His throat would have been slashed had he not put his hand up to his neck. Ortiz testified he was "fighting for his life" during the attack, and his hand, back, face, and head were slashed. One of the inmates in the attack tried to bang Ortiz's head on the wall. Although correctional officers responded to the attack by ordering the inmates to get down and thereafter by firing some shots when the inmates ignored the command, Ortiz's attackers did not immediately stop. They continued stabbing him and trying to bang his head against a wall.

---

[7]     Merriam-Webster's Collegiate Dictionary (11th ed. 2006) page 1423, column 1 states the slang usage of "whack" is "murder, kill."

24

For all of the foregoing reasons, we conclude Garcia's claim of instructional error is forfeited under the doctrine of invited error. Even if we were to assume his claim is not forfeited, it is unavailing on the merits.

## II. *CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL (COUNT 2)*

In a related claim Garcia contends that, if this court determines that defense counsel invited the trial court's "erroneous clarifying instruction" in its response to Jury Note No. 3, his attempted murder conviction must be reversed because defense counsel rendered ineffective assistance of counsel in violation of the Sixth Amendment. We reject this contention.

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685; *People v. Frye* (1998) 18 Cal.4th 894, 979). To show denial of the right to effective assistance of counsel, a defendant must show (1) his counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687, 691-692; *People v. Frye*, at p. 979.) To show prejudice, a defendant must show a reasonable probability that he would have received a more favorable result had his counsel's performance not been deficient. (*Strickland*, at pp. 693-694; *People v. Frye*, at p. 979.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra*, 466 U.S. at p. 694.) However, "a court need not determine whether counsel's performance was deficient

25

before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." (*Id*. at p. 697.)

Here, we need not address the issue of whether the performance of Garcia's counsel was deficient because Garcia has not shown, and cannot demonstrate, a reasonable probability that he would have received a more favorable result on the attempted murder charge in the absence of the claimed deficient performance of his counsel. For reasons discussed, *ante*, we have concluded the jury would not have understood the instructions to mean that Garcia could not be convicted of the attempted murder of Ortiz unless it found that Garcia (who was in his cell at the time of the attack) was the perpetrator. Rather, the jury would have understood that the prosecution was alleging Garcia was guilty of attempted murder under an aiding and abetting or conspiracy theory of criminal liability. We have also rejected Garcia's claim that the jury would not have understood that to convict Garcia of the attempted murder of Ortiz under that theory, the prosecution was required to prove beyond a reasonable doubt that Garcia knew the perpetrators of the attack on Ortiz intended to kill him.

### III. *CLAIM OF INSTRUCTIONAL ERROR* (*COUNT 1*)

Next, Garcia challenges his count 1 conviction of conspiracy to commit murder, contending the court prejudicially erred when it failed to instruct the jury sua sponte on conspiracy to commit assault with a deadly weapon as a lesser included offense of conspiracy to commit murder. We reject this contention.

A. *Applicable Legal Principles*

"The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request." (*People v. Blair* (2005) 36 Cal.4th 686, 744.) "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." (*Id.* at p. 745; see also *People v. DePriest* (2007) 42 Cal.4th 1, 50 ["Such instructions are required only where there is 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense."].)

In *Blair*, the California Supreme Court explained that "[t]o justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*People v. Blair, supra*, 36 Cal.4th at p. 745; see also *People v. Breverman* (1998) 19 Cal.4th 142, 162.)

We review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

B. *Analysis*

Citing *People v. Cook* (2001) 91 Cal.App.4th 910, Garcia asserts that conspiracy to commit assault with a deadly weapon can be a lesser included offense of conspiracy to

commit murder under the accusatory pleading test.[8] Citing *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, on which the People rely, Garcia acknowledges there is a split of authority on this issue but he asserts the reasoning in *Cook* is "more persuasive." Garcia also claims that the court's failure to sua sponte instruct the jury on conspiracy to commit assault with a deadly weapon as a lesser included offense of conspiracy to commit murder was error because substantial evidence supported the giving of that instruction.

We need not decide whether *People v. Cook* is more persuasive than *People v. Fenenbock*. We shall assume, without deciding, that the court erred by failing to sua sponte instruct the jury on the lesser included offense of conspiracy to commit assault with a deadly weapon. The People urge us to conclude that any such error was harmless under the *Watson* test for prejudice (*People v. Watson* (1956) 46 Cal.2d 818, 836), which the California Supreme Court in *People v. Breverman*, *supra*, 19 Cal.4th at pages 177– 178 made applicable to instructional errors of this sort in noncapital cases. (See *People v. Moye* (2009) 47 Cal.4th 537, 555.)

Under the *Watson* test, an error in failing sua sponte to instruct on a lesser included offense requires reversal of the conviction for the greater offense "if, 'after an examination of the entire cause, including the evidence' [citation], it appears 'reasonably

---

8    The California Supreme Court has explained that "[w]e employ two alternative tests to determine whether a lesser offense is necessarily included in a greater offense. Under the elements test, we look to see if all the legal elements of the lesser crime are included in the definition of the greater crime, such that the greater cannot be committed without committing the lesser. *Under the accusatory pleading test, by contrast, we look not to official definitions, but to whether the accusatory pleading describes the greater offense in language such that the offender, if guilty, must necessarily have also committed the lesser crime.*" (*People v. Moon* (2005) 37 Cal.4th 1, 25-26.)

probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*People v. Breverman, supra,* 19 Cal.4th at p. 178.) Probability under *Watson* "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918.) *Breverman* explained that appellate review under *Watson* "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Breverman,* at p. 177.)

Here, Garcia has failed to meet his burden of showing a reasonable probability under *Watson* that he would have obtained a more favorable outcome as to count 1 had the court sua sponte instructed the jury on conspiracy to commit assault with a deadly weapon as a lesser included offense of conspiracy to commit murder. As we now explain, the evidence supporting his conviction is so relatively strong, and the evidence that he only conspired to commit assault with a deadly weapon is so comparatively weak, that there is no reasonable probability the instructional error of which he complains affected the result.

In count 1, which charged Garcia with conspiracy to murder Ortiz, the information alleged in pertinent part that the following four overt acts were committed pursuant to the conspiracy and in furtherance of its object: (1) Garcia dictated a kite to have Ortiz

29

"murdered immediately ('whacked')"; (2) named conspirators other than Garcia assaulted Ortiz in the prison yard; (3) a named conspirator (not Garcia) "used an inmate manufactured weapon . . . to try to cut the neck" of Ortiz, "who sustained a cut to his hand when he shielded his neck from being cut by [the attacker]"; and (4) named conspirators other than Garcia "inflicted other cuts" to Ortiz.

As discussed, *ante*, the prosecution presented strong evidence establishing that Garcia's cell had been wired and numerous recordings were made of conversations between Morones and Garcia, including one showing Garcia and Morones wrote a kite ordering that Ortiz be whacked in the prison yard with no exceptions. The prosecution presented not only Ortiz's testimony that whacked meant killed, but also expert testimony establishing that whacked meant murdered. Furthermore, the prosecution's evidence of the attack on Ortiz strongly supports the jury's implied finding that Garcia and the coconspirator perpetrators intended to kill, not just stab, Ortiz. The evidence shows that numerous inmates attacked Ortiz in the yard. A razor blade was used to slash Ortiz, who covered his throat with his hand to protect his neck and who suffered a razor cut on his finger. His throat would have been slashed had he not protected his neck with his hand.

Against this strong evidence the defense presented the relatively weak testimony of Garcia himself, who admitted he made the recorded statements regarding the kite, but stated he did not want to kill Ortiz, and he threw the kite in the toilet. Garcia also stated he used the word "whack" to mean "assault" and "blow."

In rebuttal, the prosecution presented the testimony of California Department of Corrections employee Jose Leon, who stated he listened to the audiotapes of the

30

recordings from Garcia's cell. Leon testified that, on July 2, 2013, at 1:15 p.m., Garcia called for somebody to get whacked. At 2:19 p.m., there was a conversation showing that the kite Garcia had been dictating to Morones was sent out. Leon also testified that, the next day, Garcia and Morones discussed whether Ortiz was going to come out to the prison yard, that Ortiz had group yard, and Garcia said, "[T]hat's a good thing, that way we can blast the fuck out of him."

On the evidentiary record presented here, there was no basis for the jury to conclude that Garcia conspired to assault Ortiz with a deadly weapon, but did not conspire to murder him. Garcia's claim of instructional error is unavailing.

### IV. *CLAIMS OF SENTENCING ERROR*

Last, Garcia asserts the court committed three sentencing errors. First, he asserts the court erred when it imposed the count 1 consecutive 10-year gang enhancement under section 186.22, subdivision (b)(1)(C) because he was sentenced to a life term for his count 1 conviction of conspiracy to commit murder, and, thus, the court should have imposed—under the mandatory alternative sentencing provisions of section 186.22, subdivision (b)(5)—a minimum term of 15 years before Garcia may be considered for parole.

Second, Garcia claims the court erred when it imposed 10-year gang enhancements under section 186.22, subdivision (b)(1)(C) as to count 3 (solicitation of murder) and count 4 (assault with a deadly weapon by a prisoner) because neither offense is a violent felony within the meaning of that subdivision. He claims his count 4 sentence must be modified by reducing the 10-year gang enhancement to a five-year gang

31

enhancement under section 186.22, subdivision (b)(1)(B). He also claims the count 3 10-year gang enhancement must be stricken, and the matter remanded for resentencing as to that count for a discretionary determination of whether the gang enhancement punishment should be two, three, or four years pursuant to section 186.22, subdivision (b)(1)(A).

Third, Garcia claims the court erred when it failed to stay under section 654 the sentence imposed for his attempted murder conviction (count 2) because he was separately punished for his conviction of conspiracy to convict murder (count 1) and the attempted murder was the object of the conspiracy.

The Attorney General correctly agrees with all three claims of sentencing error.

DISPOSITION

The judgment is reversed in part and affirmed in part. The 10-year consecutive term imposed for the true finding on the count 1 gang enhancement allegation (§ 186.22, subd. (b)(1)) is stricken, and Garcia's count 1 sentence is modified to be an indeterminate sentence of 25 years to life with a 15-year minimum parole eligibility under 186.22, subdivision (b)(5). The 10-year consecutive term imposed for the true finding on the count 3 gang enhancement allegation (§ 186.22, subd. (b)(1)) is stricken, and the matter is remanded for resentencing as to that count for a discretionary determination of whether the gang enhancement punishment should be two, three, or four years pursuant to Penal Code section 186.22, subdivision (b)(1)(A). The 10-year consecutive term imposed for the true finding on the count 4 gang enhancement allegation (§ 186.22, subd. (b)(1)) is modified and reduced to a five-year term pursuant to section 186.22, subdivision

32

(b)(1)(B).  With the exception of the count 3 sentence, which is reversed and remanded for resentencing, the judgment is affirmed as modified.  Following Garcia's resentencing with respect to the count 3 gang enhancement, the abstract of judgment shall be corrected to reflect the modifications of the judgment, and the trial court shall forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

NARES, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.