Filed 2/24/16  P. v. Moor CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW MOOR et al.,<br><br>    Defendants and Appellants. | 2d Crim. No. B256126<br>(Super. Ct. No. PAO72172-01, -02, -03)<br>(Los Angeles County) |

Here three defendants were tried for first degree murder and conspiracy to commit murder.  Thereafter, in *People v Chiu* (2014) 59 Cal.4th 155, the California Supreme Court held that the natural and probable consequences doctrine may not be used to convict an aider and abettor of first degree murder.  Here we decide that instructional error on the natural and probable consequences doctrine was harmless beyond a reasonable doubt.

Matthew Moor, Virginia Moor,[1] and Arthur Ramirez appeal judgments after conviction by jury of first degree premeditated murder and conspiracy to commit murder (counts 1 & 4).  (Pen. Code, §§ 187, subd. (a), 189, 182, subd. (a)(1).)[2]  The jury also convicted Matthew and Ramirez of being felons in possession of firearms (counts 2

---

[1] Virginia Moor is Matthew Moor's sister-in-law.  We refer to the Moors by their first names for clarity.

[2] All statutory references are to the Penal Code unless otherwise stated.

& 3).  (§ 12021,[3] subd. (a)(1).)  The jury found true allegations that each offense was committed on behalf of a criminal street gang (§ 186.22, subd. (b)(1)(C)); and that a principal personally and intentionally discharged a firearm in the commission of the murder and the conspiracy to commit murder, proximately causing great bodily injury or death (§ 12022.53, subds. (d) & (e)(1)).  Matthew and Ramirez admitted they suffered prior strike convictions.  (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).)

The trial court sentenced Matthew and Ramirez each to 80 years to life in prison, consisting of 25 years to life for the murder, doubled to 50 years for the prior strikes, plus a consecutive term of 25 years to life for the firearm enhancement, and a consecutive term of five years for the serious felony enhancement.  The court stayed gang enhancements and the sentences for conspiracy and for being felons in possession pursuant to section 654.

The trial court sentenced Virginia to 25 years to life for the murder, plus a consecutive term of 25 years to life for the firearm enhancement.  It stayed her sentence for conspiracy pursuant to section 654.

In supplemental minute orders, the trial court imposed a 15-year minimum parole period upon each defendant (§ 186.22, subd. (b)(5)) and ordered that liability for victim restitution is joint and several.

We vacate the minimum parole period and correct the abstracts of judgment.  We otherwise affirm.

BACKGROUND

Michael Torres is a member of the Mexican Mafia.  He controls gangs in the San Fernando Valley.  Virginia, a Mexican Mafia associate, was his "secretary" and controlled street-level activities including "tax" collection and discipline for Torres while he was in prison.  She is known as "Mama Virge" and "Mom."

Matthew is a member of the San Fer street gang and an associate of the Mexican Mafia.  Ramirez is a member of the Sun Valley Diablos street gang.  Brian

---

[3] References to sections 12021 and 12022.53 are to the versions in effect prior to January 1, 2012.

2

Stansfield, also known as "Casper," is a member of the San Fer gang. Peter Ziehler (the victim) was a member of the San Fer gang, who looked like Stansfield, and was also known as "Casper." Ziehler lived in a house on Aztec Road. Humberto Gastelum is a member of the San Fer gang and an associate of the Mexican Mafia.

Stansfield (Casper) owed $1,800 to the Mexican Mafia. Virginia attempted to collect the debt without success. After she chased him with her truck in 2006, Stansfield moved to Palmdale for his safety.

In a recorded telephone conversation in 2007, Virginia said that a San Fer gang member named Casper "owes money big time," and "that motherfucker keeps running from me," and "I want that motherfucker checked." In a later call, she said, "[I]t's the wrong Casper. . . . Poor thing. He almost got beat up."

In 2011, Gastelum saw Stansfield at an Alcoholics Anonymous meeting, and Stansfield asked about Virginia. Stansfield talked about "high power . . . prison politics." Stansfield "was concerned what Virg[inia] thought of him, if [Gastelum] had heard anything."

Soon afterward, Virginia sent Mathew to the Aztec house and sent Gastelum to ensure they had the right "Casper." Matthew 's friend Ramirez also went.

Matthew and Ramirez arrived at the house in a van with Ramirez's girlfriend, Lucia Guzman, and another woman. Ziehler, Lorenzo Hurtado, Stephanie Wasson, and Adrian Quintana were at the house. Anthony Montez was visiting.

Ramirez saw Ziehler near the garage, and said, "I'll be right back. I got a homey in the car." Ramirez returned to the house with Matthew. Matthew said to Quintana, "You've got a rat in the back," and to Montez, "Mom sent me." Matthew said they would have someone "verify who the fuck he is." He said, "[A]s soon as he's verified, bam, he's got to go." Matthew said to Montez that they were going to beat Casper with a baseball bat and "take him to the thing, and we're going to 'pow, pow, pow.'" He said, "[B]efore we do anything, we're waiting on identification."

When Gastelum arrived, Matthew told him to go to the back of the house and identify Casper. Gastelum did not recognize Ziehler. But Matthew and Ramirez did

3

not wait for Gastelum's response.  They went into the backyard and shot Ziehler, then drove away in the van with the women and Gastelum.

Hurtado found Ziehler bleeding in the backyard.  He helped Ziehler into a child's wagon.  Hurtado and Quintana pulled Ziehler to the street and left him to die.

Montez told an investigator that he saw Matthew shoot Casper.  He said Matthew had a shotgun and Ramirez had a small gun.  He said the original plan was to beat Casper and then take him somewhere else to kill him.

A medical examiner testified that Ziehler's face was beaten and he was shot in the chest with a handgun and in the right buttock with a shotgun while bent over.  The shotgun blast was fatal.  At the Aztec house, a detective found a spent shotgun shell, freshly washed wet clothes, a baseball bat, and an inoperable shotgun.

Cell phone records showed that Matthew, Ramirez, and Virginia telephoned each other before and after the shooting.   The calls went through a cell tower near the Aztec house.

After she was arrested, Virginia told a police officer that she wanted to "retire."  She admitted she was "the secretary for the Mexican Mafia."  She said she controlled Torres's street level activities, including the collection of taxes and the disciplining of gang members or drug dealers if necessary.  Virginia said she collected $1,000 per month from each gang.  She said if someone did not pay, she would "track them down" and try to "barter out a deal" because "dead people can't pay."  She said that if "people wouldn't listen to reason . . . other actions would have to be taken."

A detective assigned to the San Fer gang testified that a murder committed under facts similar to those of this case would be on behalf of the San Fer gang.  He said that killing someone who has not paid taxes benefits the gang because it prevents anyone else from trying to do the same thing. The detective testified that San Fer is a criminal street gang and its primary activities are murder, robbery, and narcotics trafficking, among other things.  He described a predicate murder and a robbery committed on behalf of the San Fer gang.  He said street gangs pay a portion of the money they earn to the Mexican Mafia as taxes.  He said gangs control territory by intimidation and gain a

4

reputation through violent acts. In response to hypothetical questions, the detective said a murder is committed for the benefit and at the direction of a gang when the "boss" issues an order to his secretary, who then directs "soldiers" to carry out the killing.

A gang expert and former Mexican Mafia member, Rene Enriquez, described the Mexican Mafia street gang and its relationship with "Surenos" such as San Fer members. In response to a hypothetical based on the facts of the case, he said the murder was committed for the benefit of and at the direction of the gang because the secretary ordered the hit for money owed to the syndicate. Enriquez said the expression, "I need somebody checked" could mean they should be beaten or killed. The statement, "Mom sent me," means the order comes directly from a secretary. Carnals are the highest ranking members of the Mexican Mafia, and a secretary is under a carnal. Enriquez said Virginia was Torres's secretary, based on his experience in the Mexican Mafia and on "intercepted communications." The carnal directs members though the secretary, who can call shots and make decisions. A person can be killed for disrespecting a secretary.

A special agent for the California Department of Corrections and Rehabilitation testified to several murders committed on behalf of the Mexican Mafia. He said that the Mexican Mafia benefits when a secretary orders the murder of a drug dealer.

On count 1, the trial court instructed the jury on first and second degree murder, aider and abettor liability, the natural and probable consequences doctrine, and criminal responsibility based on an uncharged conspiracy to commit assault. On count 4, it instructed the jury on conspiracy to commit murder and the natural and probable consequences doctrine. It also instructed on the elements of assault with a deadly weapon or with force likely to produce great bodily harm.

The jury found defendants guilty on all charges. On the conspiracy counts, it found true overt acts. These included that co-conspirators "obtained approval from another co-conspirator to kill the victim," "received orders from another co-conspirator to kill the victim," "armed themselves with firearms," "entered a van," "drove to . . . where the victim lived," "physically assaulted the victim," and "shot and killed the victim."

5

DISCUSSION

*Instructions - First Degree Murder Based on Natural and Probable Consequences*
*Doctrine (Count 1 - Virginia, Matthew, Ramirez)*

The trial court erred when it instructed the jury that an aider and abettor may be convicted of first degree murder based on the natural and probable consequences doctrine. (*People v. Chiu, supra*, 59 Cal.4th 155.) But we do not reverse the convictions because we are certain beyond a reasonable doubt that the jury would have found each defendant guilty of first degree murder under *Chiu*. The verdicts imply findings that Virginia approved and ordered a killing, not an assault, and that Matthew and Ramirez acted as direct perpetrators.

An aider and abettor is guilty as a principal. (§ 31.) An "aider and abettor" is one who acts with (1) knowledge of the criminal purpose of the perpetrator and with (2) an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense. (*People v. Chiu, supra*, 59 Cal.4th 155, 161.) The aider and abettor is guilty of both the intended ("target") crime and any other ("nontarget") crime the perpetrator commits that is the natural and probable consequence of the intended crime. (*Ibid.*) Except that an aider and abettor may not be convicted of a nontarget first degree premeditated murder based on the natural and probable consequences doctrine. (*Chiu*, at pp. 158-159.) This is because the mental state for premeditated murder is "uniquely subjective and personal." (*Id.* at p. 166.) The trial court's instructions would allow the jury to find a defendant guilty of first degree premeditated murder based on aider and abettor liability for the natural and probable consequences of an assault, among other theories.[4]

---

[4] The trial court instructed the jury that, to prove murder under the natural and probable consequences doctrine, "[T]he People must prove that: [¶] 1. The defendant is guilty of Assault; [¶] 2. During the commission of an Assault a coparticipant in that Assault committed the crime of Murder; [¶] AND [¶] 3. Under all the circumstances, a reasonable person in the defendant's position would have known that the commission of the Murder was a natural and probable consequence of the commission of the Assault." (CALCRIM No. 403.)

The instruction did not apply to Matthew and Ramirez because they were not tried as aiders and abettors. They were direct perpetrators. The prosecutor argued they "physically assaulted the victim. . . . [t]hen finally shot and killed him." Their defense was identity. The jury found Matthew and Ramirez each possessed firearms and that a principal personally and intentionally discharged a firearm during the killing. Ziehler was shot by a shotgun and a handgun and there was no evidence anyone else had a firearm at the scene.

Virginia was tried as an aider and abettor. The prosecutor relied on the state of the law prior to *Chiu* and argued Virginia was guilty of first degree murder either because she knowingly encouraged a murder or knowingly encouraged an intended assault, the natural and probable consequence of which was murder. The prosecutor said that even if Virginia's order to "check" Casper was an order only to assault him, she is guilty of premeditated first degree murder because that offense is a natural and probable consequence of assault: "Maybe [Virginia] just told 'em check him. Beat 'em up, assault him. . . . Like she does in the 2007 phone call. . . . [T]he fact that [Matthew] . . . may take it a step further, that's a natural and probable consequence. And she's still guilty." Because the trial court instructed on both an unlawful and lawful theories, Virginia's conviction for first degree murder must be reversed, "unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that [she] directly aided and abetted the premeditated murder." (*People v. Chiu*, *supra*, 59 Cal.4th 155, 167.) We are convinced beyond a reasonable doubt that the jury did.

The jury found Virginia guilty of conspiracy to commit first degree murder, for which the trial court required proof that Virginia agreed with one or more of the other defendants "to intentionally and unlawfully kill." On the verdict forms, the jury marked "true" allegations against each defendant that co-conspirators "obtained approval from another co-conspirator to kill the victim" and "received orders from another co-conspirator to kill the victim." The jury's guilty verdict on conspiracy establishes that Virginia shared a common purpose to kill "Casper" and ordered his killing. Virginia did not intend that he be assaulted.

7

*Chiu* did not involve conspiracy to commit murder. Defendant Chiu participated in a spontaneous brawl. Someone hit him eight or nine times in the head before he said, "get a gun" and "shoot him" to his companion, who then shot the victim. (*People v Chiu*, *supra*, 59 Cal.4th 155, 160.) The erroneous instruction on natural and probable consequences was not harmless beyond a reasonable doubt. Jurors asked questions about aider and abettor liability and expressed reservations about putting Chiu "in the shoes" of his companion, the perpetrator, before it convicted Chiu of first degree murder. (*Id.* at p. 168.) Here, the jury asked no questions about aider and abettor liability. Its findings on the conspiracy and the evidence leave no reasonable doubt that Virginia knew of, and intended to encourage, the target offense of murder.

*Instructions - Conspiracy to Murder Based on Natural and Probable Consequences Doctrine (Count 4 - Virginia, Matthew, Ramirez)*

A defendant may not be convicted of conspiracy to commit murder as the natural and probable consequence of a conspiracy to commit a lesser offense. (See *People v. Swain* (1996) 12 Cal.4th 593, 602-603.) This is because conspiracy to commit murder requires intent to kill. (*Id.* at p. 607.) Appellants contend the combined instructions suggest that the jury could find them guilty of conspiracy to commit murder as a natural and probable consequence of a conspiracy to assault. We disagree.

The trial court instructed the jury on the natural and probable consequences doctrine concerning the charged conspiracy (count 4),[5] but that instruction required proof that the intended crime was murder: "[T]he People must prove that: [¶] 1. The defendant conspired to commit one of the following crimes: Murder; [¶] 2. A member of the conspiracy committed Murder to further the conspiracy; [¶] AND [¶] 3. Murder was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit." (CALCRIM No. 417.) The prosecutor argued, "One of

---

[5] "A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy." (CALCRIM No. 417.)

the facts we have to prove to you is that the defendants intended to agree or did agree with another to kill somebody."  The court instructed on an uncharged conspiracy to commit assault as a theory of liability for murder (count 1).  But it did not state that conspirators to an assault could be responsible for conspiracy to murder (count 4).  (CALCRIM No. 416.)

The conspiracy instructions were correct because they required proof of intent to commit the target offense (murder).  Appellants did not request clarification at trial.  (*People v. Lang* (1989) 49 Cal.3d 991, 1024 [request for clarifying language is forfeited if not raised at trial].)  Counsel was not ineffective, because the instructions on conspiracy as a whole were correct.  (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 [instructions viewed as a whole].)  And there is no reasonable likelihood the jury interpreted the instructions in an impermissible manner.  (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 & fn. 4.)  It based its verdict on express malice when it found that the defendants conspired to "commit murder" and one co-conspirator ordered the others "to kill the victim."

*Instruction - Conspiracy to Commit Lesser Offenses (Virginia, Ramirez, Matthew)*

Virginia and Ramirez contend they were entitled to instructions on conspiracy to commit assault with a firearm and conspiracy to commit assault as lesser included offenses to conspiracy to murder because the accusatory pleading alleged murder with a firearm.  Matthew joins.  The lesser offenses do not meet the statutory or accusatory pleadings tests.  Even if they did, the error is of no consequence.  The lesser offenses are not supported by the evidence.

A trial court has a sua sponte duty to instruct on all necessarily included offenses supported by the evidence.  (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149.)  This duty prevents either party from presenting the jury with an "'unwarranted all-or-nothing choice'" and encourages a verdict no harsher or more lenient than the evidence merits.  (*Id.* at p. 155.)  When conspiracy is charged, the jury must be instructed on lesser included offenses that could reasonably be true objects of the conspiracy.  (*People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1706.)  A lesser offense is included in a greater

9

offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. (*People v. Smith* (2013) 57 Cal.4th 232, 244.) An instruction on a lesser included offense should only be given if there is substantial evidence that the defendant committed the lesser offense without also committing the greater. (*Ibid.*)

The statutory test is not satisfied because the elements of conspiracy to murder do not include assault. The accusatory pleading test is not satisfied because the facts alleged did not necessarily include assault. The alleged conspiracy to murder could have been committed without assault if, for example, Matthew and Ramirez "entered [the] van," and "drove to the location where the victim lived," but stayed in the van while a non-conspirator killed Ziehler (e.g., a resident of the Aztec house). (See *People v. Parson* (2008) 44 Cal.4th 332, 349 [assault is not a lesser included offense of robbery by force or fear because robbery by force or fear may be committed without actual force].) Ramirez argued that he stayed in the van, and Matthew argued that someone else could have killed Ziehler.

The information alleged assault as one of seven alternative overt acts. But overt acts should not be considered when applying the accusatory pleading rule. (*People v. Fenenbock*, *supra*, 46 Cal.App.4th 1688, 1707.) Similarly, firearm use enhancements are not considered when determining lesser included offenses. (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1398.)

There is split authority whether overt acts should be considered when applying the accusatory pleadings test, but we adopt the view most consistent with the accusatory pleading rule. (Cf. *People v. Fenenbock*, *supra*, 46 Cal.App.4th 1688, 1707; *People v. Cook* (2001) 91 Cal.App.4th 910, 918.) In *Fenenbock*, the trial court properly refused to instruct on conspiracy to commit assault as a lesser included offense of conspiracy to commit first degree murder. Although assault was alleged as an overt act, the court held that overt acts should not be considered when determining whether the allegations included a lesser target offense. "[A]llegations of overt acts committed in

10

furtherance of the alleged conspiracy do not provide notice of lesser included target offenses." (*Fenenbock*, at p. 1708.) Conversely, in *Cook*, the court upheld a trial court's instruction on conspiracy to commit assault with a firearm as a lesser included offense of conspiracy to commit murder. It considered the overt acts and concluded that the defendant was charged with conspiracy to commit murder by means of assault with a firearm and was therefore fairly put on notice of the lesser target offense. (*Cook*, at p. 918.) In both cases, the courts affirmed the convictions.

Failure to instruct sua sponte on a lesser included offense "is not subject to reversal unless an examination of the entire record establishes a reasonable possibility that the error affected the outcome." (*People v. Breverman*, *supra*, 19 Cal.4th 142, 165.) Even if we were persuaded by *Cook* that overt acts may allege a lesser target offense, the trial court was under no sua sponte obligation to instruct on conspiracy to assault as a lesser include offence to conspiracy to murder. Ziehler was killed according to a plan to kill and under orders to kill, as the jury specifically found.

*Instruction on Lesser Offenses to Murder (Matthew)*

Matthew contends the trial court had a sua sponte duty to instruct on voluntary manslaughter, involuntary manslaughter, assault with a deadly weapon, and simple assault as lesser included offenses to murder. We disagree because manslaughter and simple assault were not supported by the evidence and assault with a deadly weapon is not a lesser included offense to murder. (*People v. Dixie* (1979) 98 Cal.App.3d 852, 856.)

A trial court must sua sponte instruct the jury on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present, but not when there is no evidence that the offense was less than that charged. (*People v. Barton* (1995) 12 Cal.4th 186, 194-195.)

There was no evidence to support a voluntary manslaughter instruction because there was no evidence that Matthew was provoked, that his passions were aroused, or that he could have perceived any threat from a man who was bent over when

11

Matthew shot him in the buttocks. Nothing rebuts the evidence of Matthew's deliberate state of mind. (E.g., "And then as soon as he's verified, bam, he's got to go.")

There was no evidence to support an involuntary manslaughter instruction because Ziehler was not killed in commission of a lawful act or a non-felonious unlawful act. He was killed by gunshots at close range.

The evidence showed either that Matthew and Ramirez murdered Ziehler or that someone else did. They also assaulted him, but there is no evidence that they only assaulted him.

*Instructions on Third-Party Culpability (Matthew & Ramirez)*

Matthew and Ramirez contend the trial court should have granted Matthew's request for an instruction on third-party culpability because Hurtado or Gastelum may have participated in the crime. The claim is forfeited because Ramirez did not raise it and Matthew's counsel conceded the instruction was not warranted. Counsel was not ineffective because the instruction would unnecessarily duplicate the reasonable doubt instruction and Hurtado's or Gastelum's culpability would not exonerate appellants.

A third-party culpability instruction is a pinpoint instruction on a defense theory of reasonable doubt. (*People v. Hartsch* (2010) 49 Cal.4th 472, 504.) The trial court is not required to give a pinpoint instruction that is argumentative or duplicates other instructions. (*Id.* at p. 500.) Third party culpability instructions "add little to the standard instruction on reasonable doubt." (*Id.* at p. 504.) "It is hardly a difficult concept for the jury to grasp that acquittal is required if there is reasonable doubt as to whether someone else committed the charged crimes." (*Ibid.*) Thus, "[e]ven if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof." (*Ibid.*)

Here, the evidence of third party participation does not even tend to exonerate Matthew or Ramirez. Third parties also may have been culpable because there was evidence Gastelum helped identify Ziehler, and Hurtado and Quintana tried to cover

12

up the crime by moving Ziehler to the street and washing clothes. But there is no evidence any of these third parties shot Ziehler or ordered his killing. Matthew's counsel was allowed to argue that Hurtado and Gastelum participated in the murder. Third party culpability is relevant only if its raises a doubt as to the defendant's guilt by linking the third person to the actual perpetration of the crime. (*People v. Lucas* (2014) 60 Cal.4th 153, 280, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.) The trial court properly refused the instruction.

*Substantial Evidence of Conspiracy to Commit Murder (Virginia)*

Substantial evidence supports Virginia's conviction for conspiracy to commit murder. We review the whole record in the light most favorable to the judgment to determine whether it contains evidence that is credible and of solid value from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Hill* (1998) 17 Cal.4th 800, 848-849.) A conviction for conspiracy requires proof the defendant and another person intended to agree to commit an offense, intended to commit the elements of that offense, and commission of an overt act by one or more of the parties to the agreement. (*People v. Jurado* (2006) 38 Cal.4th 72, 120-121.)

The jury's finding that the defendants intended to and agreed to kill the victim and committed at least one overt act in furtherance of that agreement is supported by substantial evidence. There was evidence Virginia "want[ed] that motherfucker checked," and had been trying for four years to collect the debt Casper owed to the Mexican Mafia. Virginia said if someone did not pay, she would track them down; and if they would not listen to reason, "other actions" would be taken. The codefendants called each other just before and after the murder. Virginia told Gastelum to help identify Casper. Matthew, Ramirez, and Gastelum arrived at Casper's namesake's home soon after Virginia's calls. They were armed. Ramirez looked at Casper before going back to the van for Matthew. Matthew said, "Mom sent me" and "[A]s soon as he's verified, bam, he's got to go." Virginia contends the charge was not established because "check" can mean assault, and "'[w]here the proven facts give equal support to two inconsistent inferences, neither is established.'" (*People v. Tran* (1996) 47 Cal.App.4th 759,772.) But

13

Virginia's instruction to "check" Casper is only one piece of the substantial record, which, viewed as a whole, supports the verdict.

<em>Marsden (Matthew)</em>

The trial court was not required to conduct a *Marsden*[6] inquiry with respect to Matthew because he did not clearly indicate he wanted a substitute attorney.

If a defendant requests substitute counsel, the trial court is obligated, pursuant to *Marsden*, to give the defendant an opportunity to state any grounds for dissatisfaction with the current appointed attorney. (*People v. Sanchez* (2011) 53 Cal.4th 80, 90.) If the defendant makes a showing during the *Marsden* hearing that his right to counsel has been substantially impaired, substitute counsel must be appointed as attorney of record for all purposes. (*Ibid.*) But a trial court is obligated to conduct a *Marsden* hearing only when there is "'at least some clear indication by defendant,'" either personally or through his current counsel, that he "'wants a substitute attorney.'" (*Ibid.*)

Matthew did not clearly indicate that he wanted to substitute his attorney, and his request to "'go pro per'" (which he later withdrew) did not trigger a duty to conduct a *Marsden* inquiry. (*People v. Crandell* (1988) 46 Cal.3d 833, 854-855 [a request for self-representation does not trigger a duty to conduct a *Marsden* inquiry].)

Shortly before trial was set to begin, Matthew's counsel informed the court that Matthew "wishes to go pro per." The trial court advised against it, and Matthew said, "I would like to enact my *Faretta*[7] rights." The court pointed out that self-representation was unrealistic because of the nature of the discovery, but gave Matthew the "paperwork" for requesting self-representation, and said it would set the matter for review on another date. Matthew said, "As long as it's been addressed and it's on the record you know and hopefully we can resolve this that I don't have to go to that state of my life to go pro per, you know." The court responded, "Okay. So are you making really a request to go pro per? A *Marsden*?" Matthew replied, "Yes, at this point but at the same time I don't want no more delays. If we can set a trial date in zero to 30 that would

---

[6] *People v. Marsden* (1970) 2 Cal.3d 118.)
[7] *Faretta v. California* (1975) 422 U.S. 806.)

14

be fine . . . . [W]hat I want the court to know now is I [have] been sitting in high power custody for 21 months and I don't have nothing. . . . I don't have no paperwork. I don't have nothing. No police reports anything that says me being charged of my crimes." This response was contradictory. The court asked for clarification: "Maybe you are making a *Marsden* motion. I don't know. I can't tell." Matthew did not express any concerns about his current counsel. Instead he responded, "I want to see this case heard. That's what I want." The court asked if he agreed to put the trial "over to a new zero of 30 date" if it goes to trial within that 30-day period. He said, "That's what I'm trying to say." Matthew's counsel said, "My client would like to come back." The court said, "To deal with the request as to pro per status and other issues, okay." The court ordered Matthew to come back in six days.

At the next appearance, Matthew withdrew his request to represent himself. Counsel announced, "[M]y client is not asking to go pro per at this time. He's had some time to think about it. . . . [H]e does not want to at this time so we will be continuing on and I will do my best to be . . ready for trial." The court said to Matthew, "[T]hat's fine. . . . I think you made the right decision."

Matthew did not complain about counsel, despite the trial court's invitations to clarify his request. His statement that he had received no papers might imply dissatisfaction, but it is not a "clear indication" sufficient to trigger the court's duty. (*People v. Sanchez*, *supra*, 53 Cal.4th 80, 90.)

*Motion for Continuance (Matthew)*

Matthew contends the trial court erred when it denied his request to continue trial a second time so he could obtain full "C" prison files to determine whether Ziehler was an associate of the Mexican Mafia. He argues that this information might have disproved motive by showing that Ziehler was the victim of infighting among Mexican Mafia at the Aztec house. The trial court did not abuse its discretion when it denied the motion and Matthew demonstrates no prejudice.

The trial court initially set trial for November 2013, but the court granted Matthew's first request to continue it on December 4, the day after voir dire ended. His

15

request was based on new information (gang validation packages) that showed Ziehler was an un-validated "Mexican Mafia" associate. The court excused the jury and set a new trial date for January 21, 2014. It said the new information could be relevant to impeach the prosecution's theory on motive.

On December 27, Matthew moved again to continue trial on the ground he needed more time to obtain complete and unredacted C-files and to learn whether Ziehler had ever been housed with Matthew. The trial court denied his request and granted a motion to quash. It expressed privacy concerns and said that Matthew did not demonstrate "what [he thought was] in these files [was] going to be at all beneficial." It said that review of the 1,300 pages of C-files would take months and would be "an unfettered fishing expedition." The court said, "[T]his case is already two years old and I agree it was not a surprise that this was a Mexican Mafia case."

The trial court acted within its discretion when it denied the motion. Counsel did not demonstrate good cause or the exercise of due diligence in preparing for trial on the issue of Ziehler's affiliation with the Mexican Mafia. Matthew does not demonstrate that the lack of diligence was ineffective assistance. He does not demonstrate that the decision not to pursue the C-files earlier fell below an objective standard of reasonableness, or a reasonable probability that, but for such errors, he would have achieved a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.) The C-files had only remotely possible probative value. It does not appear the outcome would have been any more favorable if the jury heard any evidence that Ziehler was associated with the Mexican Mafia, in addition to the San Fer gang.

*Expert Testimony (Matthew)*

Matthew contends the trial court should have sustained objections to the "case-specific hearsay basis" of Enriquez's opinions about Virginia's gang status and to an "unduly detailed mirroring hypothetical[]." Alternatively, he contends that the court should have given a limiting instruction. His contentions lack merit.

The trial court did not abuse its discretion when it allowed Enriquez to testify that Virginia is a secretary for a Mexican Mafia leader based on intercepted

16

communications and his experience as a Mexican Mafia member. We will not disturb the court's wide discretion to admit or exclude expert testimony unless abuse of discretion results in a miscarriage of justice. (*People v. Robinson* (2005) 37 Cal.4th 592, 630.) A qualified expert may testify about criminal street gangs if the testimony is relevant. (Evid. Code, § 801; *People v. Gonzalez* (2006) 38 Cal.4th 932, 944.) A trial court should exercise caution when an expert relies on hearsay evidence that is case specific. (*People v. Gardeley* (1996) 14 Cal.4th 605, 619.) The trial court properly exercised its discretion to control the testimony to prevent the jury from learning of incompetent hearsay when it precluded any reference to the substance of the recordings. (*People v. Price* (1991) 1 Cal.4th 324, 416.) Enriquez' opinion was highly probative on the question of whether the murder was committed at the direction of a street gang. The court did not abuse its discretion under Evidence Code section 352 when it admitted it.

The trial court did not abuse its discretion when it allowed a hypothetical that mirrored the facts of the case. A gang expert may render an opinion on the basis of facts given in a hypothetical, as long as those facts are rooted in facts shown by the evidence. (*People v. Gardeley*, *supra*, 14 Cal.4th 605, 618.) "It is required, not prohibited, that hypothetical questions be based on the evidence. The questioner is not required to disguise the fact the questions are based on that evidence." (*People v. Vang* (2011) 52 Cal. 4th 1038, 1041.)

*Sentencing - Gang Enhancements (Matthew, Ramirez, Virginia)*

The trial court erred when it imposed a 15-year minimum period for parole eligibility (§ 186.22, subd. (b)(5)) in addition to a gang-principal firearm enhancement (§ 12022.53, subds. (d) & (e)), because the prosecutor did not charge or prove that any defendant personally used a firearm.

When certain offenses such as murder are committed on behalf of a street gang, each principal is subject to an enhancement for gun use if any principal discharged or used a firearm in commission of the offense. (§ 12022.53, subds. (b), (d) & (e)(2).) But they are not also subject to an enhancement for participation in a criminal street gang (§ 186.20 et seq.) unless they personally used or discharged the firearm. (§ 12022.53,

17

subd. (e)(2) ["An enhancement for participation in a criminal street gang pursuant to [section 186.20 et seq.] shall not be imposed on a person in addition to an enhancement imposed pursuant to [§ 12022.53, subdivision (e)], unless the person personally used or personally discharged a firearm in the commission of the offense"]; *People v. Brookfield* (2009) 47 Cal.4th 583, 590.)  The existence of any fact required by section 12022.53, subdivision (b), (c) or (d) "must be alleged and either admitted or proved."  (§ 12022.53, subd. (j); *People v. Salas* (2001) 89 Cal.App.4th 1275, 1281-1282.)

The prosecution pled and proved that Matthew [and Ramirez] possessed a firearm (§ 12021, subd. (a)(1)), that a principal to the murder and the conspiracy personally and intentionally discharged a handgun causing death (§ 12022.53, subds. (d) & (e)(1)), and that the co-conspirators "armed themselves with firearms," and "shot and killed the victim," in furtherance of the conspiracy to murder (§ 182, subd. (a)(1)).  But the jury was not asked to find whether Matthew or Ramirez personally used a firearm.  Imposition of the 15-year parole eligibility requirement pursuant to section 186.22, subdivision (b)(5) must be vacated.

*Sentencing - Abstract Correction (Virginia, Matthew)*

The abstract of judgment against Virginia incorrectly shows that her sentence was imposed pursuant to the Three Strikes law.  It identifies "PC 667(b)-(i) or PC 1170.12."  No prior strikes were pled or proven against Virginia.  The abstract must be corrected to eliminate the reference to the Three Strikes law.

The trial court ordered that liability for victim restitution would be joint and several.  (§ 1202.4, subd. (f); *People v. Neely* (2009) 176 Cal.App.4th 787, 800.)  The abstract of judgment should be corrected to clarify that the defendants' liability for victim restitution is joint and several.

The abstract of judgment correctly identified subdivision (d) of section 12022.53 in connection with the sentence of 25 years to life for count 1.  The abstract need not be corrected to also identify section 12022.53, subdivision (e)(1), which does not identify the applicable term of commitment.

18

DISPOSITION

We vacate the imposition of a 15-year parole eligibility requirement pursuant to section 186.22, subdivision (b)(5) with respect to Matthew Moor, Virginia Moor and Arthur Ramirez. We order that the abstracts of judgment be corrected with respect to all three defendants to show that liability for victim restitution is joint and several. We further order that the abstract of judgment with respect to Virginia Moor be corrected to eliminate the reference to "PC 667(b)-(i) or PC 1170.12." In all other respects, the judgments are affirmed.

NOT TO BE PUBLISHED.


GILBERT, P.J.

We concur:


YEGAN, J.


PERREN, J.

19

Laura F. Priver, Judge

Superior Court County of Los Angeles

_____


Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant Virginia Moor.

Joseph Shipp, under appointment by the Court of Appeal, for Defendant and Appellant Matthew Moor.

Edward H. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant Arthur Ramirez.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, Rama R. Maline, Deputy Attorney General, for Plaintiff and Respondent.